# UNITED STATES v. LOUISIANA.

## APPEAL FROM THE COURT OF CLAIMS.

Submitted October 11, 1887. — Decided October 24, 1887.

The Court of Claims has jurisdiction of an action by a State against the United States for a demand arising upon an act of Congress.

The action of a State in the Court of Claims to recover moneys received by the United States from sales of swamp lands granted to the State by the act of September 28, 1850, is not barred by the statute of limitations until six years after the amount is ascertained from proofs of the sales before the Commissioner of the General Land Office.

The direct tax laid by the act of August 5, 1861, did not create any liability on the part of the States, in which the lands taxed were situated, to pay the tax.

THE case is stated in the opinion of the court.

*Mr. Attorney General* and *Mr. Heber J. May* for appellant, cited: *United States v. Ravara,* 2 Dall. 298; Spear Fed. Judiciary, 252.; *Ames v. Kansas,* 111 U. S. 449; *Ex parte Russell,* 13 Wall. 664; *United States v. McDougall's Administrator,* 121 U. S. 89; *State of Texas Case,* 7 C. Cl. 301; *State of Illinois Case,* 20 C. Cl. 342; *State of New Hampshire Case,* 20 C. Cl. 394; *Rice v. United States,* 122 U. S. 611; *Wright v. Roseberry,* 121 U. S. 488; *Five Per Cent Cases,* 110 U. S. 471; *Marshall's Case,* 21 C. Cl. 308; *Ramsay's Case,* 14 C. Cl. 367; *Woolner's Case,* 13 C. Cl. 355; *Portland Company's Case,* 5 C. Cl. 441; *Nichols v. United States,* 7 Wall. 122; *Davidson's Case,* 21 C. Cl. 298, and cases therein cited.

*Mr. William E. Earle* for appellee, cited: *Turner v. Smith,* 14 Wall. 553; *Beauregard v. Case,* 91 U. S. 134; *Baldwin v. Stark,* 107 U. S. 463; *Marquez v. Frisbie,* 101 U. S. 473; *Shepley v. Cowan,* 91 U. S. 330; *Speidel v. Henrici,* 120 U. S. 377; *Emigrant Co. v. County of Wright,* 97 U. S. 339; *Emigrant Co. v. County of Adams,* 100 U. S. 67; *Mills County v. Railroad Companies,* 107 U. S. 557; *Ames v. Kansas,* 111

U. S. 449; *Börs* v. *Preston,* 111 U. S. 252; *Five Per Cent Cases,* 110 U. S. 471; *Tennessee* v. *Davis,* 100 U. S. 257; *State of Texas Case,* 7 C. Cl. 301; *State of Illinois Case,* 20 C. Cl. 342; *State of New Hampshire Case,* 20 C. Cl. 394.

MR. JUSTICE FIELD delivered the opinion of the court.

This action was brought in the Court of Claims by the State of Louisiana against the United States, to recover two demands, amounting in the aggregate to the sum of $71,385.83. The first of these demands arises upon the act of Congress of February 20, 1811, 2 Stat. 641, c. 21, " to enable the people of Orleans to form a constitution and state government," the fifth section of which declared that five per cent of the net proceeds of the sales of lands of the United States, within her limits, after the first day of January next ensuing, should be applied to laying out and constructing public roads and levees in the State, as its legislature might direct. Pursuant to the authority thus conferred, the people of the Territory of Orleans, represented in a convention called for that purpose, formed themselves into a State, by the name of Louisiana, and adopted a constitution under which the State was admitted into the Union. The five per cent of the net proceeds of sales of lands of the United States, made between July 1, 1882, and June 30, 1886, and due to the State by the United States, as found by the Commissioner of the General Land Office, amounted to $47,530.79.

The second of these demands arises upon the act of Congress of September 28, 1850, 9 Stat. 519, c. 84, " to enable the State of Arkansas and other States to reclaim the swamp lands within their limits," and the act of March 2, 1855, 10 Stat. 634, c. 147, " for the relief of purchasers and locators of swamp and overflowed lands." The act of September 28, 1850, granted to the States then in the Union all the swamp and overflowed lands, made unfit thereby for cultivation, within their limits, which at the time remained unsold. The second section made it the duty of the Secretary of the Interior, as soon as practicable after the passage of the act, to prepare a list of the lands

described and transmit the same to the Governor of the State, and at his request to cause a patent to be issued therefor. It would seem that this duty was not discharged; and, notwithstanding the grant was one *in præsenti*, many of the lands falling within the designation of swamp and overflowed lands were sold to other parties by the United States. The act of March 2, 1855, was designed to correct, among other things, the wrong thus done to the State; it provided that, upon due proof of such sales, by the authorized agent of the State, before the Commissioner of the General Land Office, the purchase money of the lands should be paid over to the State. Such proof was not made, but equivalent proof was submitted to the Commissioner as to the character of the lands from the field notes of the Surveyor General of the State. This mode of proof was accepted by the Commissioner in other cases as early as 1850. The amount found in this way by the Commissioner on the 30th of June, 1885, to be due to the State from the United States, on account of sales of swamp lands to individuals, made prior to March 3, 1857, was $23,855.04.

It does not appear that there was any serious contest in the Court of Claims, either as to the validity or the amount of these demands; but it was objected that the demand arising upon the acts of September 28, 1850, and of March 2, 1855, was barred by the statute of limitations, and that both demands were set off by the unpaid balance of the direct tax levied under the act of August 5, 1861, 12 Stat. 292, which was apportioned to the State of Louisiana. The First Comptroller of the Treasury had, at different times previous to the commencement of this action, admitted and certified that the sums claimed were due to the State on account of the five per cent net proceeds of sales of the public lands, and on account of sales of swamp lands within the State purchased by individuals; but had directed the amounts to be credited to the State on account upon the claim of the United States against her for the unpaid portion of the direct tax mentioned.

It was, also, objected in the Court of Claims, and the objection is renewed here, that that court had no jurisdiction, under the Constitution and laws of the United States, to hear

and determine a cause in which the State is a party in a suit against the United States. This objection, therefore, must first be examined; for, if well taken, it will be unnecessary to consider the other questions presented.

The Constitution declares that "the judicial power of the United States shall be vested in one Supreme Court, and such inferior courts as Congress may from time to time ordain and establish," and "that the judicial power shall extend to all cases in law and equity arising under this Constitution, the laws of the United States, and treaties made or which shall be made under their authority; to all cases affecting ambassadors, other public ministers, and consuls; to all cases of admiralty and maritime jurisdiction; to controversies to which the United States shall be a party; to controversies between two or more States; between a State and citizens of another State; between citizens of different States; between citizens of the same State claiming lands under grants of different States; and between a State or the citizens thereof and foreign States, citizens, or subjects." This clause was modified by the Eleventh Amendment, declaring that "the judicial power shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another State, or by citizens or subjects of any foreign State."

As thus modified, the clause prescribes the limits of the judicial power of the courts of the United States. The action before us, being one in which the United States have consented to be sued, falls within those designated, to which the judicial power extends; for, as already stated, both of the demands in controversy arise under laws of the United States. Congress has brought it within the jurisdiction of the Court of Claims by the express terms of the statute defining the powers of that tribunal, unless the fact that a State is the petitioner draws it within the original jurisdiction of the Supreme Court. The same article of the Constitution which defines the extent of the judicial power of the courts of the United States, declares, that "in all cases affecting ambassadors, other public ministers, and consuls, and *those in which a State shall be party*, the Supreme Court shall have original jurisdiction. In all other

cases," "the Supreme Court shall have appellate jurisdiction, both as to law and fact, with such exceptions and under such regulations as the Congress shall make." Although the original jurisdiction of the Supreme Court, where a State is a party, as thus appears, is not in terms made exclusive, there were some differences of opinion among the earlier judges of this court whether this exclusive character did not follow from a proper construction of the article. In a recent case, *Ames* v. *Kansas*, 111 U. S. 449, this question was very fully examined, and the conclusion reached that the original jurisdiction of the Supreme Court, in cases where a State is a party, is not made exclusive by the Constitution, and that it is competent for Congress to authorize suits by a State to be brought in the inferior courts of the United States. In that case, it is true, the action was commenced by the State in one of her own courts, and, on motion of the defendant, was removed to the Circuit Court of the United States, and the question was as to the validity of this removal. The case having arisen under the laws of the United States, it was one of the class which could be thus removed, if the Circuit Court could take jurisdiction of an action in which the State was a party. It was held that the Circuit Court could take jurisdiction of an action of that character, and the removal was sustained. The judiciary act of 1789, it is true, declares that "the Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature where a State is a party, except between a State and its citizens, or between a State and citizens of other States, or aliens, in which latter cases it shall have original but not exclusive jurisdiction." This clause, however, cannot have any application to suits against the United States, for such suits were not then authorized by any law of Congress. There could, then, be no controversies of a civil nature against the United States cognizable by any court where a State was a party. The act of March 2, 1875, in extending the jurisdiction of the Circuit Court to all cases arising under the Constitution or laws of the United States, does not exclude any parties from being plaintiffs. Whether the State could thereafter prosecute the United States upon any demand in the Circuit Court, or the Court

of Claims, depended only upon the consent of the United States, they not being amenable to suit except by such consent. Having consented to be sued in the Court of Claims, upon any claim founded upon a law of Congress, there is no more reason why the jurisdiction of the court should not be exercised when a State is a party, than when a private person is the suitor. The statute makes no exception of this kind, and this court can create none.

The statute of limitations does not seem to us to have any application to the demand arising upon the swamp-land acts. The act of 1850 contemplates that the Secretary of the Interior will identify the lands described, and although the State could not be deprived of her rights by the inaction of that officer, *Wright* v. *Roseberry*, 121 U. S. 488, 501, she was not obliged to proceed in their assertion in the absence of such identification. By the act of 1855, which provided for the payment to the State of moneys received by the United States on the sales of swamp lands within her limits, the payment was made to depend upon proof of the sales by the authorized agent of the State before the Commissioner of the General Land Office. No such proof was ever made or offered, and, therefore, until in some other equally convincing mode the swampy character of the lands sold was established to the satisfaction of the Commissioner, no definite ascertainment of the amount due to the State was had, so as to constitute a ground of action for its recovery in the Court of Claims. The method of proving the character of such lands by having recourse to the field-notes of the public surveys of the Surveyor-General of the State was adopted by the Commissioner as early as 1850, and was followed by him in this case in 1885. On the 30th of June of that year, he found in this mode and certified that there was due to the State from such sales the amount stated above. From that date only the six years within which the action could be brought in the Court of Claims began to run; and this action was commenced in September of the following year.

Nor do we regard the unpaid portion of the direct tax laid by the act of Congress of August 5, 1861, which was appor-

tioned to Louisiana, as constituting any debt to the United States by the State in her political and corporate character, which can be set off against her demands. 12 Stat. 292, c. 45. That act imposed an annual direct tax of twenty millions "upon the United States," and apportioned it to the several States of the Union. It directed that the tax should "be assessed and laid on the value of all lands and lots of ground, with their improvements and dwelling houses." (Sec. 13.) It was assessed and laid upon the real property of private individuals in the States. Public property of the States and of the United States was exempted from the tax. Its apportionment was merely a designation of the amount which was to be levied upon and collected from this property of individuals in the several States, respectively. The provisions of the act are inconsistent with any theory of the obligation of the States to pay the sums levied. It provides for the appointment of officers to assess the property to the different holders, and to collect the tax, and directs with minute detail the proceedings to be taken to enforce the collection, either by a distraint and sale of the personal property of the owners, or, that failing, by a sale of the real property taxed. It allows, it is true, the different States to assume the amounts apportioned to them respectively, and to collect the same in their own way by their own officers. Many of the States did thus assume the amounts, and in such cases it may well be considered that for the sums assumed they became debtors to the United States, and, so far as any portion of those sums has not been paid, that they still remain debtors. But, unless such assumption was had, no liability attached to any State in her political and corporate character. The liability was upon the individual land owners within her limits. The act declares that the amount of the taxes assessed "shall be and remain a lien upon all lands and other real estate of the individuals who may be assessed for the same during two years after the time it shall annually become due and payable." (Sec. 33.) Louisiana never assumed the payment of the taxes apportioned to her, or of any portion of them. She allowed the government to proceed by its officers to collect the tax from the property

Opinion of the Court.

holders. The amount apportioned to her was $385,886.67; the amount collected from the owners of land was $314,500.84; leaving only a balance of $71,385.83. It is not for us to suggest in what way this balance may be collected. After the war, the Secretary of the Treasury was authorized to suspend the collection of the tax in any of the States previously declared in insurrection, until January, 1868, and subsequently this authority was extended to January, 1869. 14 Stat. 331, c. 298, § 14; 15 Stat. 260, c. 69. The Secretary acted upon this authority, and suspended the collection. It is stated that, since 1869, no attempts have been made by the executive department to enforce its collection in those States. Be that as it may, it is enough for the disposition of the present case, that the unpaid balance of the tax apportioned to Louisiana constitutes no debt on the part of the State in her political and corporate character to the United States.

We p  ive no error in the judgment of the court below, and it is, therefore,

*Affirmed.*

UNITED STATES *v.* ALABAMA. UNITED STATES *v.* MISSISSIPPI. Appeals from the Court of Claims. MR. JUSTICE FIELD. The questions presented in these cases are covered by the decision in the case of *The United States* v. *The State of Louisiana;* and, in conformity with it, the judgments in them must be affirmed. So ordered.

*Mr. Attorney General* and *Mr. Heber J. May* for appellant in each case.

*Mr. Van H. Manning* for appellee in each case.