(96 South. 121)

No. 25527.

## ALBRITTON v. STEERE.

(April 2, 1923.)

*(Syllabus by Editorial Staff.)*

**1. Public lands ☞152—Statute prohibiting purchase or entry of lands adversely possessed not repealed.**

Act No. 21 of 1886, forbidding purchase or entry of public lands possessed, improved, or cultivated by person holding or claiming adversely to the purchaser or entryman, was not repealed by Act No. 215 of 1908, requiring public lands to be sold at public auction.

**2. Public lands ☞61(11)—One applying to enter land under warrant held to acquire no vested right as against the state.**

One applying to enter land under warrant issued and sold under Act No. 248 of 1852 acquired, as against the state, no vested right in the land.

**3. Public lands ☞61(11)—Statute authorizing sale of warrants did not dedicate land to their redemption or prevent withdrawal from entry and sale.**

Act No. 248 of 1852, authorizing issuance and sale of land warrants to be located on swamp or overflowed lands did not dedicate to their redemption all land received under the swamp land grant, or deprive state of right to withdraw lands from sale or entry.

**4. Public lands ☞61(11)—One not owning scrip when lands withdrawn from entry, and knowing of such withdrawal before entry, could not rely on alleged vested rights.**

Even if holders of warrants had vested right of which they could not be deprived by Act No. 21 of 1886, forbidding purchase or entry of lands possessed, improved, or cultivated by adverse claimant, one not owning warrant at date of the act of 1886, and knowing, when he applied thereafter to locate it, that land was possessed adversely, could not rely on such vested right.

**5. Public lands ☞61(11)—No presumption that scrip was owned by plaintiff at date of statute withdrawing land from entry.**

There is no presumption that scrip on which plaintiff attempted to enter land 35 years after the enactment of Act No. 21 of 1886 was owned by him at the date of such act.

**6. Public lands ☞61(11)—Warrant held not locatable on land erroneously approved to state as swamp lands, and theretofore entered by adverse claimant.**

Land warrant under Act No. 248 of 1852, subject to be located on swamp lands, did not authorize holder to enter high land fit for cultivation which was approved to the state as swamp land, by error and in ignorance that it had previously been sold.

**7. Public lands ☞60—Interior Department held authorized to issue patent on entry which had never been canceled.**

Where certificate of entry from the United States to high land thereafter erroneously included in state's approved selections of swamp lands had never been legally canceled, the Interior Department had jurisdiction to issue a patent thereon.

**8. Public lands ☞60—Interior Department's approval of state's selection of swamp lands which included high land previously entered did not convey good title.**

Approval by Secretary of Interior of state's list of swamp land selections erroneously including high land, for which United States had issued certificate of entry to another, did not convey good title, in view of reservation in the list and the swamp land grants of lands rightfully claimed by individuals, and in view of Act No. 336 of 1850 and Act No. 196 of 1852 and Act Cong. March 2, 1855 (U. S. Comp. St. §§ 4961, 4962), whereby Congress and the state recognized titles so acquired.

**9. Public lands ☞60—Swamp land grant was present grant, but not of lands erroneously certified as swamp lands.**

Act Cong. March 2, 1849 was present grant to the state of all of the government's swamp or overflowed lands, and subsequent approvals identifying the lands related back to date of grant, but the grants were not present grants of high lands thereafter erroneously certified as swamp lands.

**10. Public lands ☞60—Purchaser of high lands which were subsequently erroneously identified as swamp lands acquired good title.**

Where land for which defendant's predecessor received final certificate of entry in 1850 was not in fact swamp land, and was not until afterwards erroneously identified as swamp land on land office records, the entryman acquired good title, as against state claiming under swamp land grant.

Appeal from Third Judicial District Court, Parish of Claiborne; J. E. Reynolds, Judge.

Suit by Alvin R. Albritton against A. C. Steere, in which defendant called George T. Shaw as warrantor, and in which the State of Louisiana intervened. From a judgment for defendant and his warrantor, plaintiff and the State appeal. Affirmed.

Cross & Moyse, of Baton Rouge, for appellant Albritton.

A. V. Coco, Atty. Gen., and Paul A. Sompayrac, Asst. Atty. Gen., for the State.

Barksdale, Clark & Van Hook and Thigpen, Herold & Lee, all of Shreveport, for appellees.

O'NIELL, C. J. This is, in its main aspects, a repetition of the suit of Albritton v. Shaw, 148 La. 427, 87 South. 32. In that case the present plaintiff sued the warrantor of the present defendant for the same tract of land that is claimed in this suit; that is, the N. E. ¼ of N. E. ¼ of Sec. 25, T. 21 N., R. 8 W., containing 40.37 acres.

[1] In his first suit plaintiff claimed title by virtue of a state patent dated the 1st day of February, 1919, and claimed that the state had acquired title by the swamp land grant of the 2d of March, 1849. The defendant in that suit (who afterwards sold the land to the defendant in this suit) held title by mesne conveyances from Thomas J. Harvey, who had bought the land and received a final certificate of entry from the United States on the 17th of December, 1850, but had not obtained a patent for the land. Our ruling in the case was that the patent held by the plaintiff was null because it had been issued in violation of a prohibitory law. It violated the Act 21 of 1886, forbidding the "purchase or entry" of any public land that had "been possessed or improved or cultivated by any person holding or claiming adversely to the party seeking to purchase or enter the same." Section 1. The land had been possessed and improved and cultivated by Thomas J. Har-

vey and in turn by those whose title came from him, continuously, nearly 70 years, when plaintiff got his patent. The prohibition in Act 21 of 1886, against any outsider's buying or entering such lands, was not repealed by the Act 215 of 1908, requiring the public lands of the state to be sold only at public auction, after advertisement in the manner provided by the statute.

When we found that plaintiff's patent was null, there was no occasion for deciding whether the state or Harvey had acquired the title from the United States. We did decide, however, because the issue was tendered for decision at the outset, that the purchase by Harvey from the United States, on the 17th of December, 1850, as shown by his certificate of entry, gave the defendant, holding title from Harvey, at least an inceptive, equitable title, and the right, therefore, to question the validity of the plaintiff's patent. We said that, although the certificate of entry on which the defendant's title was founded had not been followed by a patent in favor of Harvey or his heirs or assigns, it was evidence of an equitable title of sufficient importance to allow the defendant, in possession of the land, to insist that a suit to oust him should not be brought by one who could not be adjudged the owner of the land, if the defendant did not own it.

It is said in a brief filed for the state of Louisiana, as intervener in this case, that we expressed the opinion, or intimated, in Albritton v. Shaw, "that the Shaw title derived from the Harvey entry was not valid." We did not believe, and endeavored to avoid any intimation, that the Shaw title derived from Harvey was not valid. Here is what we said, in avoidance of an expression of opinion on the subject, which was then a moot question, viz.:

"Some of the decisions on this subject, both by the Supreme Court of the United States and by this court, would be pertinent to the question whether the defendant in this suit should be decreed the owner of the land in con-

test, even though the state patent held by the plaintiff should not be decreed null." [Meaning, of course, was not issued in contravention of a prohibitory law.] "But we are not now concerned with the question whether the defendant might be adjudged the owner of this land, in an action brought by the state, if the officers of the land department were without authority to issue the patent to the plaintiff. * * * We will review the decisions on this subject merely to demonstrate that, in our opinion, the possession which the defendant and his authors have enjoyed for nearly seventy years is founded upon a claim of sufficient equity to demand that it shall be respected by any and every person except one who could be adjudged the owner of the land, if the defendant should not be adjudged the owner of it. * * *

"According to the decisions heretofore cited, it would be a begging of the question to decide, before passing upon the question of validity of plaintiff's patent, whether the claim of the defendant, who holds possession under the certificate of entry that was issued to Thomas J. Harvey, should prevail over the claim of the state under the swamp land grant of 1849; for, if the state patent was issued in contravention of a prohibitory law, it is absolutely null. Rev. Civ. Code Art. 12. * * *

"Our conclusion is that the patent held by the plaintiff in this case was issued in violation of a prohibitory law and is therefore null."

One of the arguments urged by plaintiff in his first suit, to the defendant's questioning the validity of his patent, was that the Commissioner of the General Land Office had, on the 9th of May, 1899, issued an order purporting to cancel the certificate of entry that had been issued to Thomas J. Harvey on the 17th of December, 1850. We held that the order purporting to cancel the certificate of entry was without effect, for want of jurisdiction. The order had been issued without actual notice to any one claiming title or holding possession under the certificate of entry.

Immediately after—on the third day after —our decision in Albritton v. Shaw became final by the refusal of an application for rehearing, Albritton applied to the register of the state land office for another patent for the same land, and the new patent, on which this suit is brought, was issued to him two months later; that is, on the 15th of March, 1921.

In the meantime, while Albritton's first suit was pending on appeal in this court, the defendant, Shaw, filed a petition with the Secretary of the Interior against the state of Louisiana and A. L. Albritton, praying for the exercise of the supervisory authority of the Department, to rescind and set aside the order of May 9, 1899, canceling Thomas J. Harvey's cash entry, of date December 17, 1850, and to reinstate the entry and direct that a patent should issue. A few days later, Shaw sold the land to the defendant, Steere, who prosecuted the proceedings before the Interior Department, and finally procured the reinstatement of the Harvey entry and a patent for the land, of date the 21st of December, 1921.

Photographic copies of the proceedings had before the Secretary of the Interior, in the matter entitled "George T. Shaw v. The State of Louisiana, A. R. Albritton, Patentee," were introduced in evidence in this suit. The district court gave judgment for the defendant, Steere, and for George T. Shaw, who was called in warranty to defend the suit, rejecting the demand of Albritton, and dismissing the petition of intervention of the state of Louisiana by a judgment of nonsuit. The state and Albritton have appealed.

The only difference between plaintiff's new patent and the one that was declared null in his first suit is that the entries were made on different kinds of scrip. The first entry was made on scrip that had been issued under the Act 104 of 1888. The second entry was made under scrip that had been issued under Act 248 of 1852. The statute of 1888 authorized the register of the state land office, whenever it appeared that two entries of the same land had been made, to cancel the invalid or erroneous entry, and issue to the entryman a warrant to be located on

other state lands of the same class. Act 248 of 1852 authorized the register of the land office and the state treasurer to issue and sell warrants for 1,000,000 acres of land, to be sold for not less than $1.25 an acre, to be located on the swamp or overflowed lands acquired by virtue of the swamp land grants.

The argument made in support of plaintiff's new patent is that the Act 21 of 1886, forbidding the "purchase or entry" of any public lands that had "been possessed or improved or cultivated by any person holding or claiming adversely to the party seeking to purchase or enter the same," could not be construed as forbidding an entry under scrip issued under Act 248 of 1852, without giving the statute of 1886 the unconstitutional effect of divesting a vested right. We quote the argument from the brief filed by plaintiff's counsel, viz.:

"The moment the court holds, as it practically has done, that the defendant, by reason of Act 215 of 1908, has lost his preference right to enter this land, his case dissolves into thin air, for the reason that it admits the right of the state to sell the land by auction under Act 215. But, if the state has a right to sell, she cannot sell at public auction, but must sell to Albritton, who, by his application to enter this land under his warrant, had acquired, as against the state, a vested right in this land."

[2] Albritton did not, by his application to enter this land under his warrant, acquire, as against the state, a vested right in the land. When Albritton made application to enter the land, the register of the state land office was forbidden, by Act 215 of 1908, to allow any one "to enter or purchase" any land that was open to entry or purchase, except at public auction after advertisement in the manner provided by the statute. And the register of the land office was, even before the enactment of the statute of 1908, forbidden by Act 21 of 1886 to allow a purchase or entry of this particular tract of land by any person other than the defendant's authors in title, who had been occupy-

ing, improving, and cultivating the land, under the title emanating from Harvey's cash entry, of December 17, 1850.

It is a matter of no importance whether the Act 215 of 1908, withdrawing from private sale or entry all of the state lands that were theretofore subject to sale or entry, deprived the defendant's authors in title of any preference right that they may have had to enter this land under the provisions of the Act 21 of 1886. Defendant's authors have never desired to enter the land under the provisions of the Act 21 of 1886, because they have believed always that they owned the land, by mesne conveyances from Thomas J. Harvey, and by virtue of his cash entry from the United States, on December 17, 1850.

[3-5] The Act 248 of 1852 did not have the effect of depriving the state of her right to withdraw any lands from the list of lands subject to sale or entry. It would be unreasonable to hold that every acre of land belonging to the state under the swamp land grant of 1849, when the Act 248 of 1852 was enacted, was thereby dedicated to the redemption of the warrants authorized by the statute, and remained so dedicated until the last warrant was redeemed. Even if it should be held that when the Act 21 of 1886 was enacted, the holders of warrants that had been issued under the Act 248 of 1852 held a vested right, which the statute of 1886 could not deprive them of, to enter lands that were possessed or improved or cultivated by other persons, the plaintiff here could not invoke such ruling. There is neither proof nor allegation—and surely no presumption—that the scrip on which he made his second attempt to enter this land was owned by him when the Act 21 of 1886 was enacted, 35 years before he undertook to locate the scrip. When he applied to locate his scrip on this tract of land, he had just been judicially informed that the land was then, and had been for nearly 70 years, possessed by

George T. Shaw and his authors in title, and had not been subject to entry by any one else since the Act 21 of 1886 was enacted.

[6] But, when we come to the merits of this case, there is another reason why a purchaser of a warrant issued pursuant to Act 248 of 1852 was not thereby invested with an indefeasible right—or any right whatever, for that matter—to enter this land; that is, that the warrants were, by the very terms of the statute, to be located only on swamp or overflowed lands acquired by the state by virtue of the swamp land grants. This land was in 1849, and has been ever since, high land, fit for cultivation. It was by error, and in ignorance, not only of the character of the land, but also of the fact that it had already been sold to Thomas J. Harvey, that the Department of the Interior approved this land to the state as swamp or overflowed land, on the 6th of May, 1852; that is, nearly two months after the Act 248 of 1852 was adopted.

Our conclusion is that plaintiff's new patent is not valid. It was issued in violation of the same prohibitory law that made his other patent for this land invalid.

The state's having intervened in this suit, claiming the land by virtue of the swamp land grant, makes the nullity of plaintiff's patent a matter of little or no importance to the defendant, or his warrantor. The Attorney General does not insist that the state owns the land. On the contrary, for reasons which we need not discuss, he insists, primarily, that the plaintiff's patent is valid. It is only in the event that the patent should be declared not valid that the state claims the land.

In Albritton v. Shaw, supra, it was supposed by all parties, including the court, that the state's selection of this land, although not approved until a date subsequent to Harvey's purchase, was reported to the General Land Office "ten days before Harvey got his certificate of entry." In that we were mis-

taken. The records of the General Land Office in Washington show that the list of selections containing this tract, and embracing a total area of 226,674.93 acres, was "examined and approved" by the surveyor general of the land office at Donaldsonville, La., on the 7th of December, 1850; that is, 10 days before Harvey got his certificate of entry from the Natchitoches (La.) office. But the list was not received at the General Land Office until the 7th of February, 1851—that is, nearly two months after Harvey had entered the land—and, from the fact that Harvey was, in the meantime, allowed to enter the land at the Natchitoches office, the presumption is that the list of selections, including this tract, had not then been received at the Natchitoches office.

[7] It is contended on behalf of appellants that the Interior Department did not have authority or jurisdiction to reinstate Harvey's entry or to direct that a patent should issue thereon. It is admitted on behalf of appellants that the cancellation of Harvey's entry, on the 9th of May, 1899, was null for want of jurisdiction. Hence it is said, by appellant's counsel, that the case must be determined as if Harvey's entry had never been canceled. That being the status of the entry, the Land Department, in our opinion, did have jurisdiction to perform the ministerial function of issuing a patent in pursuance of Harvey's cash entry.

[8] Be that as it may, the validity of the patent depends upon whether Harvey's cash entry was valid. Our own judgment is that the error of the Secretary of the Interior, in allowing this tract of high land to remain included in the list of swamp land selections that were approved by him, did not convey a valid title to the state, especially under the reservation, at the beginning of the list, excepting from the approval such lands as were rightfully claimed or owned by individuals.

The reservation was made, not only in the swamp land grants of 1849 and 1850, but also

in the caption or heading of the list of selections of the 226,674.93 acres, in which this tract of 40.37 acres of high land was erroneously included, viz.:

"List of swamp and overflowed lands, unfit for cultivation, selected as enuring to the state of Louisiana under act of Congress approved 2d March, 1849, in the Northwestern District, excepting such as are rightfully claimed or owned by individuals."

Counsel for appellants rely upon the general rule stated in French v. Fyan, 93 U. S. (3 Otto) 169, 23 L. Ed. 812, that the approvals by the Secretary of the Interior, certifying as swamp or overflowed lands, not fit for cultivation, lands selected by the states under either of the swamp land grants, is conclusive of the legal title; and that, in an action at law, no inquiry can be made into the sufficiency of the evidence by which it was proven to the Secretary's satisfaction that the land was, in fact, swamp or overflowed land. In the case cited, Mr. Justice Miller, for the court, quoted with approval from Johnson v. Towsley, 13 Wall. 72, 80 L. Ed. 485, the general rule with regard to actions at law, and this qualification:

"On the other hand, there has always existed in the courts of equity the power in certain classes of cases to inquire into and correct mistakes, injustice, and wrong in both judicial and executive action, however solemn the form which the result of that action may assume, *when it invades private rights;* and by virtue of this power the final judgments of courts of law have been annulled or modified, and patents and other important instruments issuing from the Crown, or other executive branch of the government, have been corrected or declared void, or other relief granted." (The italics are ours.)

[9] It is settled by repeated decisions of the Supreme Court of the United States that the Act of March 2, 1849 (9 Stat. 352), was a grant to the state of Louisiana, in præsenti, of all of the government's swamp or overflowed lands in the state, and that the subsequent approvals by the Secretary of the Interior, by which the lands that were conveyed by the grant are identified, relate back to the date of the grant. But that is true only with regard to lands that were in fact, by virtue of their being swamp or overflowed land, conveyed by the grant. Surely, the swamp land grants of 1849 and 1850 were not grants, in præsenti, of the government's high lands, in the sense that every subsequent entry or purchase of the government's high lands was made subject to the risk that the Interior Department might, at any time thereafter, destroy the title of the entryman, by falsely or erroneously certifying that the land was swamp or overflowed. The swamp land grants of 1849 and 1850 did not put an end to the right of the United States government to allow individuals to enter or purchase the vacant high lands of the United States. The Acts of 1849 (9 Stat. 352) and 1850 (Act Sept. 28, 1850 [U. S. Comp. St. §§ 4958–4960]) did not warn individuals who thereafter bought high lands from the United States that, although the high lands which they bought were not then, they might thereafter be, erroneously, of course, identified as swamp or overflowed lands, by approval of the Secretary of the Interior.

The state of Louisiana, by acts of the Legislature, has recognized the well-known fact that, after the swamp land grants of 1849 and 1850 were enacted, the land offices, in disposing of the government's high lands to individuals, often sold lands that were swamp or overflowed, and that should have been approved to the state as such. The Legislature has ratified all such sales made to individuals, and has accepted from the United States the proceeds of the sales. In Act 336 of 1850 it was said:

"That for all lands granted to the state by the act of second of March, 1849, which have been sold since the passage of that act by the United States; and for all of said lands since, appropriated in any manner by the general government, the Governor shall apply to the general government for the refunding of the money for which such lands were sold, and,

when such lands have been located or appropriated, for the value of those lands at $1.25 per acre, and on such payment being made, the state will waive all claim to such lands, and the title from the United States shall vest the fee in the grantee and patentee."

More than a year after Thomas J. Harvey had bought this land from the United States, and while the state's selection was pending and before it was approved, the Legislature again recognized and ratified the sales that had been made to individuals by the United States, even of the swamp or overflowed lands, subsequent to the Act of March 2, 1849. We refer to the Act 196 of 1852, approved March 15, 1852, viz.:

"Whereas, by an act of Congress approved on the second day of March, eighteen hundred and forty-nine, all the swamp and overflowed land in this state was ceded to this state, for the purpose of aiding the state of Louisiana to reclaim the overflowed lands; and, whereas, many individuals have purchased, at the different land offices of the United States, within this state, portions of the swamp and overflowed land, and the money in payment for said land has been paid into the treasury of the United States; and, whereas, by right, all sums of money received by the receivers of the several land offices, in payment for swamp and overflowed land, shall be paid over to the treasury of this state; therefore,

"Be it enacted by the Senate and House of Representatives of the state of Louisiana, in general assembly convened, that the treasurer of this state be, and he is hereby, authorized and required to apply to the proper department of the general government for all sums of money received by the fiscal officers of said government in payment for swamp or overflowed lands lying within this state, that have been sold by them subsequent to the second March, eighteen hundred and forty-nine, and said treasurer is hereby authorized to receipt for all sums received, and he shall place the amounts so received in the treasury of the state, to the credit of the fund for levees and drainage."

Adverting again to the contention of the appellants that the Act 248 of 1852 invested the purchasers of the warrants that were issued pursuant thereto with a right to enter any of the state's swamp lands, even lands that were possessed or improved or cultivated by individuals claiming title, it is important that the Act 196 of 1852, which we have quoted in full, was approved only two days before the Act 248 was approved. In other words, at the same session, only two days before authorizing the issue of the warrants, such as the plaintiff, Albritton, surrendered for his patent, the Legislature expressly recognized, and authorized the treasurer to ratify the titles like that which Thomas J. Harvey had acquired from the United States after the swamp land grant of 1849 was enacted. And, later, the Legislature pursued the same policy by the Act 21 of 1886, entitled an "Act for the protection of settlers on the state's lands," giving to them and to all persons who had "possessed or improved or cultivated" any of such land a preference right to enter the land, and protecting them absolutely by declaring:

"That no purchase or entry of any public lands belonging to the state of Louisiana shall be allowed, when previous thereto, such lands have been possessed or improved or cultivated by any person, holding or claiming adversely to the party seeking to purchase or enter the same."

The Congress of the United States also by Act of March 2, 1855 (U. S. Comp. St. §§ 4961, 4962), recognized the titles acquired by individuals, even for swamp lands, from the United States after the enactment of the swamp land grants. The statute authorized the President to issue patents to purchasers or locators of lands "claimed as swamp lands," and the statute was expressly made applicable to cash entries, as well as to entries by land warrants or scrip, or under any homestead or pre-emption law, prior to the issue of a patent to the state.

Inasmuch as the state of Louisiana had, by Act 248 of 1852, authorized the sale of the swamp land warrants at $1.25 per acre, the state was compensated exactly by collecting that price from the United States, for all lands that the United States had sold to in-

dividuals after the enactment of the swamp land grants. Thomas J. Harvey's cash entry, by the way, was made for $1.25 an acre; and the inference is that the state collected the money from the United States. In or about the year 1887 the state brought suit against the United States, in the Court of Claims, on two demands, one of which was for the purchase price received by the United States for all lands sold to individuals after the enactment of the swamp land grants of 1849 and 1850 and previous to March 3d, 1857. The amount found due to the state in that way was $23,855.04; and the judgment of the Court of Claims, in favor of the state, was affirmed on appeal. See United States v. State of Louisiana, 123 U. S. 32, 8 Sup. Ct. 17, 31 L. Ed. 69. Thereafter, the state of Louisiana brought another suit on a similar demand, before the Court of Claims, and obtained judgment. On appeal, the claim was found to be correct, but the judgment was reversed because the debt was offset by an obligation which the state owed to the United States. See United States v. State of Louisiana, 127 U. S. 182–192, 8 Sup. Ct. 1047, 32 L. Ed. 66. The printed reports of these decisions do not show whether Harvey's cash entry was one of the sales for which the state was compensated. But the inference is that compensation for this tract of 40.37 acres was included in the state's suit; because, although the land was not, in fact, swamp or overflowed land, it had been approved to the state as if it was swamp or overflowed land, after it had been sold to Thomas J. Harvey. If the state was not compensated for the sale of this land to Harvey, it must have been because it was not, in fact, swamp or overflowed land, and the state was therefore not entitled to it.

[10] The controlling fact in this case—the fact on which the Secretary of the Interior rested his decision—is that the land which Thomas J. Harvey bought and paid for and received a final certificate for, on the 17th of December, 1850, was not swamp or overflowed land, either in fact or by a false identification as swamp or overflowed land on the records, either of the General Land Office, at Washington, or of the local land office, at Natchitoches. The Secretary of the Interior, in his final ruling in favor of the defendant in this suit, of date the 2d of July, 1921, quoted a history of the erroneous selection of this land, given in a report made by the Commissioner of the General Land Office, dated the 22d of June, 1921, viz.:

Swamp land selection list No. 1, Natchitoches series, which embraced the NE.¼ NE.¼, Sec. 25, T. 21 N., R. 8 W., La. Mer., was signed by U. S. Surveyor General Boyd on December 7, 1850.

That list, embracing 226,674.93 acres in ninety-three townships, was prepared by I. Claxton Taylor, an agent for the state of Louisiana, who alleged that the lands were selected by him from the field notes of the government surveys.

The list was then "examined and approved" by the Surveyor General at Donaldsonville, on the date above mentioned.

The list has this statement at the beginning of it:

"List of swamp and overflowed lands, unfit for cultivation, selected as enuring to the state of Louisiana under act of Congress, approved 2d March, 1849, in the Northwestern District, excepting such as are rightfully claimed or owned by individuals."

The "Register of Letters Received" shows that on January 27, 1851, the U. S. Surveyor General transmitted thirteen lists of swamp lands, and that they were received here on February 7, 1851. While it cannot be stated, at this late day, for a certainty that this list was one of the thirteen then received, it is a fair presumption that it was.

When the clear list was submitted for Departmental approval by Commissioner Butterfield, he informed Secretary Stuart that the selection list had been separated into seven lists, as follows:

No. 1 embraced the tracts "to the approval of which no objections appear on the tract books of this office," and approval of this list of lands was recommended, "So far as they do not conflict with the claims and rights of others."

No. 1A embraced tracts that were sold and located prior to the date of the grant.

No. 1B embraced tracts that were sold and located since March 2, 1849.

No. 1C embraced tracts for which pre-emption declaratory statements had been filed.

No. 1D embraced tracts within the limits of private claims.

No. 1E embraced tracts that had been selected by the state under the act of September 4, 1841 (5 Stat. 453), and the most of them already approved to it.

No. 1F embraced tracts in school sections sixteen and lands reserved for a Seminary of Learning.

It is evident, from this statement, that the selection list was made up without due care.

The letter to the Secretary concluded with this statement:

"These lists were carefully made up to the 25th August last. Sales and locations interfering with the list, which it is proposed to approve, may have been made since that time, and, if so, the parties who made them will have an opportunity of testing their rights, if they desire to do so, and the Governor will be so advised."

Our conclusion is that the defendant, having the same title that Thomas J. Harvey acquired by his cash entry, on the 17th of December, 1850, is the owner of this land.

The judgment appealed from is affirmed, at the cost of the plaintiff, appellant.

DAWKINS, J., concurs in the decree.