UNITED STATES, as Trustee, etc., and ex rel. CHARLEY et al. v. McGOWAN (BAKERS BAY FISH CO. et al., Interveners).

SAME v. BAKERS BAY FISH CO. et al.

Nos. 331, 396.

District Court, W. D. Washington, S. D.

Jan. 29, 1931.

Thos. P. Revelle and Anthony Savage, U. S. Dist. Attys., both of Seattle, Wash., John T. McCutcheon, Asst. U. S. Dist. Atty., of Tacoma, Wash., and W. H. Smiley, of Hoquiam, Wash., for the United States.

John H. Dunbar, Atty. Gen., and L. B. Donley and E. W. Anderson, Asst. Attys. Gen., for the State of Washington.

Welsh & Welsh, of South Bend, Wash., and H. G. & Dix H. Rowland and Stuart H. Elliott, all of Tacoma, Wash., for defendant McGowan.

G. C. & A. C. Fulton, of Astoria, Or., and Kelly & MacMahon, of Tacoma, Wash., for

defendants Bakers Bay Fish Co. and Thompson.

CUSHMAN, District Judge.

In every controlling feature, save as herein noted, the above-entitled cases are not dissimilar. The suits are to protect the Quinaielt and Quillehute Indians in rights to fish claimed under a treaty.

The bills of complaint, while signed by the United States attorney, recite that they are made pursuant to authority conferred by the Attorney General of the United States. The suit against McGowan was first begun.

In both suits the United States sues as guardian and trustee of the rights reserved to the Quinaielt and Quillehute Indians by the Treaty of July 1, 1855, and January 25, 1856 (12 Stat. 971; Indian Affairs Laws and Treaties, Kappler, vol. II [2d Ed.], page 719).

Heretofore a temporary restraining order was denied in suit No. 396–E. Thereafter the cases were tried together.

Article 3 of the above-mentioned treaty provides:

"Article III. The right of taking fish at all usual and accustomed grounds and stations is secured to said Indians in common with all citizens of the Territory, and of erecting temporary houses for the purpose of curing the same; together with the privilege of hunting, gathering roots and berries, and pasturing their horses on all open and unclaimed lands. Provided, however, That they shall not take shell-fish from any beds staked or cultivated by citizens.  *  *  * "

The bill of complaint in suit No. 396–E against the Bakers Bay Fish Company et al. alleges:

"VII. That each year from time immemorial, the Indians of said tribes and bands of Quinaielt and Quillehute Indians have been wont to visit certain usual and accustomed fishing places from a point near the mouth of the Columbia River, and hereinafter in the paragraph described, to Dahlia in the County of Wahkiakum, in the State of Washington, for the purpose of catching food fishes for their immediate and future needs, and among others were certain locations situated on the north bank of the Columbia River, in Pacific County, Washington, and on Peacock Spit, in Pacific County, Washington, opposite to and adjoining the Fort Canby Military Reservation, and being in Township Nine (9), North of Range Eleven (11), West of Willamette Meridian.

"That with the increased commercial fishing on the Columbia River, the plaintiff, George Charley, Mitchell Charley and Roland Charley, selected and claimed in the behalf and for the benefit of the Quinaielt and Quillehute Indians, a particular fishing place more particularly described as follows:

"Those certain tidelands situated in front of, adjacent to, or abutting upon Lots three (3) and four (4), Section nine (9), Township nine (9) north, of Range Eleven (11), West of the Willamette Meridian, including Peacock Spit, as shown upon the map of the mouth of the Columbia River prepared by the United States Engineer's Office, Second Portland, Oregon, District of May, 1928.

"Said place is further identified as the usual place where George Charley, as a Quinaielt Indian, has been accustomed to fish for fifty (50) years last past, and with drag seine for several years last past.

."This fishing place, as in this paragraph generally and particularly described, was at the time of said treaty, always has been and now is, one of the usual and accustomed places to which Indians belonging to one or more of the tribes and bands of Quinaielt and Quillehute Indians, have continually resorted for the purpose of securing fish, and which place said tribes and bands of Quinaielt and Quillehute Indians and their Indian representatives have fished according to their custom and more civilized methods except when prevented by high water or by the threats and acts of the defendants, W. L. Thompson, and Bakers Bay Fish Company, its officers, agents and employees, as hereinafter particularly set forth and complained of."

The allegations in the other suit touching this matter are not materially different from the above.

For the sake of brevity, the earlier suit will be referred to as the McGowan suit and the later as the Bakers Bay Fish Company suit. In this opinion the word "plaintiff" refers to the United States and the word "defendants" to the defendants in both suits unless otherwise stated, except the state of Washington named as defendant in the later suit.

Bulletin 30, Smithsonian Institution, Bureau of American Ethnology, edited by Frederick Webb Hodge, will be referred to herein as the Handbook of American Indians. The Northwest Coast; or Three Years' Residence in Washington Territory, by James G. Swan, will be referred to herein as Mr. Swan's book.

In the McGowan suit complaint is made that there has been interference with the fishing rights of said Indians in suing out in the superior court of the state of Washington certain restraining orders and by acts of force and violence on the part of the defendant.

After the beginning of the McGowan suit, the Bakers Bay Fish Company leased from the state of Washington certain lands embracing tide or shore lands on which it is the claim of plaintiff such Indians had the right to draw their nets, being the same lands described in the McGowan suit. These lands will be referred to as Peacock Spit.

Thereupon the Bakers Bay Fish Company intervened in the McGowan Case, as likewise did the state of Washington. Thereupon the suit against the Bakers Bay Fish Company, No. 396–E, was begun.

The answer of McGowan admits: " * * * that from time immemorial the Indians of said tribes and bands of Quinaielt and Quillehute Indians were wont to visit certain usual and accustomed fishing places on the Columbia River from its mouth to Dahlia in the County of Wahkiakum, in the State of Washington, for the purpose of catching food fishes for their immediate and future needs; that there were certain fishing locations situated on the north bank of the Columbia River in Pacific County, Washington, but he expressly denies that Peacock Spit on the Columbia River in Pacific County, Washington, adjoining the Fort Canby Military Reservation * * * was one of the usual and accustomed fishing places of the Quinaielt and Quillehute Indians at the time of the treaty or that it has ever been * * * one of the usual and accustomed fishing places of the Quinaielt and Quillehute bands of Indians."

The Bakers Bay Fish Company, intervener in the McGowan Case, makes no similar admission to the foregoing, but denies not only that any portion of Peacock Spit has at any time been used or occupied by any of such Indians as a fishing ground or station, but also denies that the Quinaielt and Quillehute Indians had been wont to visit certain usual and accustomed fishing places from a point near the mouth of the Columbia river to Dahlia in the county of Wahkiakum, state of Washington. The answer of the intervener state of Washington makes similar denial. In the Bakers Bay Fish Company suit, that company and the state of Washington make similar denials.

The defendant McGowan, in his answer, claims the right to fish on Peacock Spit by virtue of certain drag seine licenses issued to him by the state of Washington and locations

made by him on Peacock Spit thereunder and their renewals.

The Bakers Bay Fish Company alleges that McGowan is in no wise interested; that his possessory right in the locations made by virtue of said drag seine licenses was extinguished by the subsequent leasing by the defendant Bakers Bay Fish Company from the state of Washington of Peacock Spit, which, at the time of said leasing, was the sole and exclusive property of the state of Washington.

While the defendant Bakers Bay Fish Company contends that its leases from the state of Washington terminate any right that McGowan had on Peacock Spit under his drag seine licenses and locations, which contention McGowan denies, the issue so presented the court will not undertake to determine.

As stated, the state of Washington is also named as a defendant in the second suit and intervened in the first.

The Eleventh Amendment is not applicable to a suit of the character of these cases. Title 28, USCA § 341, provides: "The Supreme Court shall have exclusive jurisdiction of all controversies of a civil nature where a State is a party, except between a State and its citizens, or between a State and citizens of other States, or aliens. * * *"

The present suit comes within none of these exceptions. The foregoing provision has no application to suits upon claims of a state against the United States (United States v. Louisiana, 123 U. S. 32, 8 S. Ct. 17, 31 L. Ed. 69) because Congress has consented that the United States may be sued in the Court of Claims. No statute of the state of Washington has been called to the court's attention authorizing a suit such as the present against the state to be brought in a District Court of the United States. An examination of the bill of complaint, however, shows that no affirmative relief is asked against the state of Washington, although it is prayed that the court confirm the treaty rights of the Quinaielt and Quillehute Indians, including the individual plaintiffs above named as members of the former tribe, in and to the use and enjoyment, as a usual and customary fishing ground upon the tidelands described in the bill without license or lease from the state of Washington. This court may consider the rights and powers of the state in determining issues asserted by the United States against the individual and corporate defendants, claiming under rights acquired from the state, although it may not undertake to determine and enforce such rights against the state itself or its officers.

The Bakers Bay Fish Company and defendant W. L. Thompson further allege: "That this defendant never at any time has denied, and does not now claim that it has an exclusive right to take or catch any fish in the waters of said Columbia River, in front of or adjacent to said Peacock Spit, or elsewhere, or the exclusive right to operate drag seines, or any fishing devices therein, but has ever claimed and still claims the right of exclusive possession of the whole of the part of Peacock Spit leased to it by the State of Washington, at all stages of the tide, and the exclusive right to land drag seines on its shores at all points at all stages of the tide, and it is as to such rights and such rights only that defendant contends for as against the plaintiffs in this, the United States, and all of its Indian wards, as well as to all the world."

The issue made in the McGowan Case, it will be observed from the foregoing statements, is narrower than that made in the Bakers Bay Fish Company Case; McGowan admitting that certain parts of the lower Columbia river already described were usual and accustomed fishing grounds of the Quinaielt and Quillehute Indians, while the defendants Bakers Bay Fish Company and W. L. Thompson deny it. The broader denials of the last-named defendants will therefore be considered and determined.

The evidence shows, and it is not disputed, that the Bakers Bay Fish Company and W. L. Thompson forcibly prevented certain individual Indians, including George Charley, named as a plaintiff, from landing and drawing their seines on the shores of Peacock Spit.

Washington Irving describes the mouth of the Columbia river in Astoria, which has been introduced in evidence. This description is as follows (page 127, vol. II):

"The Columbia or Oregon, for the distance of 30 or 40 miles from its entrance into the Sea is, properly speaking, a mere estuary, indented by deep bays so as to vary from 3 to 7 miles in width.

"The mouth of the River, proper, * * * formed by the contracting shores of the estuary; the entrance from the Sea, as we have already observed, is bounded on the south side by a flat sandy spit of land stretching into the ocean; this is commonly called Point Adams; the opposite or northern side is Cape Disappointment, a kind of peninsula terminating in a steep knoll or promontory,

\* \* \* connected with the mainland by a long and narrow neck. Immediately within this Cape is a wide open bay terminating at Chinook Point, so-called from a neighboring tribe of Indians; this was called Baker's Bay. \* \* \* "

The fishing grounds directly in question are adjacent to Cape Disappointment and between it and Sand Island which partly separates Bakers Bay from the Columbia river. On the northern or Washington shore of the estuary mentioned by the author are the following places mentioned by various witnesses: These are here named in the order of their location from the river's mouth at Cape Disappointment easterly: Ft. Canby, Ilwaco, Chinook (New Chinook), Ft. Columbia, Scarboro Head or Hill, McGowan (Old Chinook), Point Ellis, Dahlia, Skamokawa, and Cathlamet.

The Quinaielt Indians (a Salish tribe) occupied the Pacific Coast territory between the Quillehute and Quaitsos on the north and the Chehalis on the south. The Chehalis occupied the country along the Chehalis river and about Grays Harbor, with a few villages on the north end of Shoalwater Bay. The Chehalis were a more numerous tribe at the time of the treaty meeting evidently than the Quinaielts. Mr. Swan's book, p. 346. In volume IV of the Original Journals of the Lewis & Clark Expedition, p. 169, evidently in speaking of the Quinaielts, they are referred to as a nation who resided six days march to the northwest (from the Expedition's headquarters on the Columbia estuary).

The reservation created by the treaty and enlarged by Executive Order for the Quinaielts is more than sixty miles north of the Columbia river, and embraces much of the territory formerly occupied by them. Within its boundaries is the Quinaielt river, on which was their principal village, Taholah. This reservation is on the Pacific Coast a little more than halfway north from the Columbia river to the Straits of Juan de Fuca.

The Quillehutes occupied territory still further to the north of the Quinaielts. Handbook of American Indians, vol. II, p. 340. The places mentioned by the witnesses in their testimony between the Columbia river and the Quinaielt river and reservation, naming them from the south toward the north, are: Seaview, Ocean Park, Bay Center, Oysterville, Bruceport, near which was Georgetown, Tokeland, Westport, and Damon's Point.

Two bays or harbors indent the coast between this reservation and the Columbia river, the northerly of which, Grays Harbor, is at its broadest point twelve or fifteen miles in width and of a little greater length, into which there flow a number of rivers, Elk river, Johns river, the Chehalis, Wishkah, Hoquiam, and Humptulips rivers.

The second harbor, called both Willapa Harbor and Shoalwater Bay, is some twenty miles in length from north to south, and indents the coast ten or twelve miles. Into it also flow a number of rivers and creeks, including Cedar, North, Smith, Willapa, Bonne, Palix, Williams, Nemah, Nasel, and Bear rivers. This harbor or bay will herein generally be referred to as Shoalwater Bay, as that appears to be the older name.

Testimony by the following witnesses for plaintiff touching the broader issue made by the denials of the Bakers Bay Fish Company and W. L. Thompson as to any usual and customary fishing grounds and stations of the Quinaielt Indians in the estuary of the Columbia river was given as follows:

H. S. McGowan, defendant in case No. 331–E, called as a witness for the plaintiff, testified:

That he resides at McGowan, where he was born when it was still called Chinook; that he is 64 years of age; that he has lived most of his life at McGowan; that McGowan was named after witness' father; that witness' business is principally that of fishing and canneries; that from about 1853 or 1855 his father became permanently interested in fishing, using various methods, but drag seining was a considerable item in it; that witness and his brothers became interested in this business when they were old enough to go in business; that witness fished with Quinaielt Indians at the place in question in 1900, 1902, and 1903 under the management of Johnnie Johns, a *Quinaielt* Indian; that the latter has several brothers; that witness does not recall the names of all of the crew; thinks there were between ten or twenty; the reason witness did not continue to fish with Quinaielt Indians was that the War Department served notice upon the witness that after 1903 every one would have to ask for a permit which would not be exclusive and they might be put off at any time at the pleasure of the officer; because of this, witness could not bring Indians down, as he did not know they could have any continuous employment at fishing; the following year the War Department leased all of Sand Island, so called, in five seining sites; witness acquired the rights on two of these; fished until and in-

cluding 1907; these areas were re-leased to the Columbia River Packers' Association; that was the last time witness could have Indians down there on that "so-called" Sand Island; when Peacock Spit built up on the west, witness got hold of George Charley and made an agreement with him to fish together there in 1924 and went back with their gear to where they were in 1903; when witness was a small boy he saw Indians coming and going from down through Bakers Bay and that region, only one, two, or three that witness knew of his own knowledge; witness knew that they were fishing for sturgeon; that was in 1874, 1875, and 1876; they were fishing for sturgeon mostly, but they caught salmon as well; historically and in conversations with the Indians and witness' father and family "it was the settled conviction of all of us" that the Quinaielt and *Quillehute* Indians came down possibly not every year but certainly continuously came down and fished around the mouth of the Columbia river further back than any white man could give any testimony; "it was just considered historical tradition of the country and the general knowledge and acceptance of everybody around there, that is, that were familiar with these fishermen"; witness would not say that he had seen many full-blood Indians fishing with gill nets, but a few, but a good many of them that are called Indians, and probably justly so, "some half-breeds, three-quarter breeds"; that "the old location of Pacific City was south of the north boundary line of Cape Disappointment or Fort Canby Military Reservation, which is a point running about easterly and westerly through where North Head is"; the old location was along the shore, mostly to the southerly of that line, south of Ilwaco and north of the southern hook of the Cape; witness has no personal knowledge of old Indian villages down near the Cape in the early days, but historically there were large Indian settlements and towns substantially where Ilwaco is now; the definite location is not exactly known by any one "but there is a lot of information along that line you find in these old historical works, some of it that you find by talking to Indians, old settlers, and some of it that has never been put in book form, or at least I never encountered a lot of that. But, as near as I have been able to discover there was a large village from around where Ilwaco was, a fishing encampment in the vicinity, and that Indian village was destroyed by an epidemic of small-pox very early, the time uncertain; before any of the Americans * * * but that is hazy and unsettled, and unknown"; that country had wonderful resources in oysters and clams on the Willapa Harbor side and wonderful resources of salmon and sturgeon on the Columbia river side; there was a narrow isthmus there; there was a stream leading from Shoalwater Bay as far as Black Lake within a quarter of a mile of the Columbia river; the Indians did travel back and forth there; it was not as far as a quarter of a mile a good many years ago; there remains a swamp on each side of Ilwaco that approaches within two hundred yards of Black Lake; the Quinaielt Indians never had trouble with the Chinooks to witness' knowledge; of course it is tradition that the Indians had battles in that region, but witness had no knowledge or information concerning any trouble; the upper Chinook village extended from Point Ellis on the east to Ft. Columbia or Scarboro Hill on the west; when witness was a youngster, the woods there extended easterly from Ft. Columbia about half a mile and possibly a quarter of a mile north and south, and contained the remains of a great many burial canoes; the Indians transported a lot of fish from the Columbia river back to Grays Harbor and the Quinaielts every fall fished for witness' father and had a share of the fish; they had a large per cent. of the sturgeon caught because they were not commercially valuable and other smaller size fish that were taken in the nets; the salmon heads were prized by the Indians and also the fat from the steel heads; at the end of the regular fishing season they would use the nets and gear for catching other fish if they needed a further supply for the winter; they always went home loaded down in their canoes with dried salmon and sturgeon every year; witness never saw the Quinaielts make the ocean trip, but stated he had every reasonable ground to know they did make it frequently; did not live close enough to the ocean to see them; it was witness' opinion that the Quinaielts were much superior to the Chinooks as boatmen on the ocean; the first commercial canning of fish on the Columbia was up near a place called Eagle Cliff about forty-five miles up the river from McGowan where a salmon cannery was established about 1866, but salmon were salted before that and packed in barrels and shipped to the Sandwich Islands; that was the business of witness' father in 1855, 1856, and 1857, such fish being caught along the bank of the Columbia river near Point Ellis and down to what is now called Ft. Columbia and Scarboro Head and some westerly from there and some down toward Ilwaco (of the places named, the farth-

est up the river is Point Ellis, which is about ten miles); the fishing below Point Ellis had not become very extensive before 1874, 1875, or 1876 on account of the damage done to nets by the sturgeon; during the years mentioned the white fishermen made war on the sturgeon; after the beginning of the suit in which this witness is a defendant, an agreement as to the decree was reached by which the witness understood that he recognized the right of these Indians to fish there under the treaty and "he recognized my right"; witness expressed his willingness, "in fact I agreed the Indians had a common right of fishery there under the treaty. * * * I had an agreement with George Charley in the beginning of 1924 to fish on 'his' grounds together, recognizing his rights and he recognizing my rights and he was going to do the fishing with his crew. * * * In furtherance of that agreement with George Charley, he brought his crew down there in 1924, and went to work, and I supplied him with everything that he needed, excepting labor, which he furnished, and just as soon as we got started to work, the commanding officer at Fort Stevens ordered us off of Peacock Spit, alleging we were trespassing on a United States Military Reservation"; in March, 1925, the Attorney General of the United States gave an opinion touching Peacock Spit to the effect that it was not a part of the military reservation.

The Attorney General's opinion, in fact, was:

"First. Peacock Spit and all other tide lands lying within one and one-half miles of the southern point of Cape Disappointment were not reserved by the order of 1852, and do not belong to the United States, although the use of such lands has been granted by the State of Washington to the United States for military purposes, so long as the adjoining shore lands are so used.

"Second. The State of Washington may legally permit fishing upon and in the vicinity of such tide lands." Opinions of Attorney General, vol. 34, pp. 435, 436.

McGowan further testified that George Charley brought his crew there in 1925 and 1926 and fished.

The statement of the witness McGowan concerning the Quillehutes is the only testimony in this case in support of any claim on their part in this matter.

Johnnie Johns, a witness for the plaintiff, testified: That he was 84 or 94 years of age; that he belonged to the Chinook Tribe, his mother telling him that he belonged to the Willapa.

As above noted, defendant McGowan testified that Johnnie Johns was a Quinaielt Indian.

The "Willopah" was a Chinook Tribe on Willopah Harbor (Shoalwater Bay). Handbook of American Indians, pt. 2, p. 955, heading "Willopah."

This witness testified further that he was living at Taholah, on the Quinaielt reservation, and had for about sixteen years; that he was born on Damon's Point on Grays Harbor and does not know how old he was when he removed to Willapa Harbor, where he married and lived a number of years at Georgetown; occupation, fishing around Chinook since 15 years of age; first saw Quinaielt Indians fishing at Chinook for Chinook salmon when he was about 10 years old, also around Cape Disappointment; that in the later season they followed the fish up the river; since he could remember they have been fishing in the Columbia; before his time his ancestors told him that before there were any whites or American men the Chiefs of the Quinaielt and Columbia River Indians got married and they were related by marriage; that they came every year; "as far as my forefathers remember they fished there and lived there every season, coming to the Columbia River by canoe," one way by the ocean and the other leading the canoe by the edge of the surf. (Swan, in his book at pages 268–274, gives a description of this latter method of canoe travel.)

Witness further testified to going from the head of Shoalwater Bay through a slough and Black Lake over a short portage with the canoe into Bakers Bay; that the portage is about a half a mile; that he went by way of the ocean three times into the Columbia river; that four canoes would go together, the biggest carrying about twenty people; about twelve in the smallest they took through; that they not only fished for salmon but sturgeon; there was an Indian village inside the cove at what they now call Ft. Canby; that after the salmon were dried they were kept for winter use; that when fishing under an arrangement with McGowan in 1902 and 1903 he had a crew of twenty-four; that they came from the Quinaielt reservation; that they received the last day's catch of fish; that Chemamus was George Charley's uncle; that he lived at Westport (on Shoalwater Bay); that he was born a Quinaielt.

This witness was repeatedly asked concerning "Chenamus Village," and finally said, "I didn't know there was any village or anything named by that name but 'it' was Chema-

mus in there,—he was one of the leading chiefs there at Westport—the only name, something came pretty close, that I know of."

James Julius, a witness for the plaintiff, testified: That he was 90 years old; born in Chinook Tribe; that the Quinaielt Indians lived at Chinook; that he first saw Quinaielt Indians when he was about 12 years old; that they were in Chinook; that he first saw them fishing at Sand Island when he was about 20 years old; that they fished up as far as Cathlamet; that the Quinaielt Indians came to the Columbia river every summer; that he has seen the Quinaielt Indians coming over the Columbia river bar about fifteen or eighteen in a big canoe; that two or three big canoes would come at a time with eighteen, nineteen, or twenty Indians in a canoe; that as a matter of Chinook Indian history and tradition the Chinooks and Quinaielts were friendly; they traded with one another, intermarried and the Quinaielts settled there; that they fished together at the mouth of the Columbia river and as far up the river as Cathlamet and Dahlia.

Margaret George, a witness for the plaintiff, an allottee on the Quinaielt reservation whose father was not an Indian, testified that she lived at *Bay Center,* located on Shoalwater Bay; that she was 84 years of age; born at Astoria, Or.; that her grandfather lived at Taholah, the principal village on the Quinaielt reservation; that she was half Quinaielt and half Westport (Westport is located on Grays Harbor in a region formerly occupied by the Chehalis); that the Indians called Cape Disappointment "Nus-Hayiges-Mls," meaning in their tongue "rock"; that she was a little girl when she left Astoria going over to the other side of the river at McGowan's place (Old Chinook) where she was raised and stayed until she was grown up; that at that time there were Indians and Frenchmen who had Indians for their wives at Chinook; that the Indians were Chinook, Clatsops, and Quinaielts, and sometimes the Chehalis came over there; that these Indians lived mostly on fish; that they fished on the Columbia river from the mouth up close to Cathlamet; that the Quinaielts came in good weather around by the ocean and bad weather overland, coming in canoes, sometimes three canoes coming around with from six to fifteen in a canoe; when they came overland they came from Shoalwater Bay, their canoes being hauled in a wagon, sometimes coming by Black Lake; that there was an Indian village on the north bank of the Columbia on Bakers Bay around Cape Disappoint-

ment, "Hay-mtls"; that "we used to have a little home up there"; that in drying the fish they had a little shack on the bank of the river and smoked the fish; that they made mats out of cattails (reeds) enough to make a shack; that the Quinaielts would take the dry fish home with them; that they came down when she was a girl every year; that she first saw them when about 10 years old; that the Quinaielts had been going down to the mouth of the Columbia river to fish ever since before she was born; when no white people were there that they came to fish every year; that she was so told by her uncle and her aunt (her mother's brother and sister), who have been dead a long time; that, after the soldiers came to Ft. Canby [1] they did not come any more, but fished way up the river. This witness has six children, the residence of only one of whom is shown; he is working at South Bend on Willapa Harbor.

Alice Jackson, a witness for the plaintiff, testified: That she was 75 years of age, born at Taholah, on the Quinaielt reservation where she has resided all her life; that she is a *full-blooded Quinaielt* Indian, and that Chief Taholah was her father; that the Quinaielt Indians lived chiefly on fish, elk meat, deer meat, and clams; that when a small girl her people went to the Columbia river to fish; that she did not go with them; that there were twice as many Quinaielt Indians then as now. (It is stated in the Handbook of American Indians, under "Quinaielt," that Lewis and Clark described them in two divisions with 200 and 1,000 population, respectively. It is further stated that in 1909 they numbered 156).

Witness further testified that her mother's oldest brother, now deceased, told her how the Quinaielts went to the Columbia river to fish for Chinook salmon; that he told her that he used to go to the Columbia river and stayed with his uncle who was a *Chinook* and helped him fish at the Columbia river; that this uncle lived at Nus-Hayiges-Mls, where there used to be an old Indian village when he was a young man; that they had the village for fishing early spring Chinook salmon; that he went there every spring to fish because they did not have enough fish at Quinaielt.

This witness was 19 when she was married and came to the Columbia river from Quinaielt, going out on the ocean to Damon's Point, across to Westport (both on Grays Harbor), thence by wagon to Tokeland and

[1] Ft. Canby was built in 1863-64. History of the Oregon Country by Harvey W. Scott, vol. I, p. 287.

Bay Center, past Oysterville (places on Shoalwater Bay), thence again by wagon to Ilwaco, hauling their canoe.

Witness' father's sister married a Columbia man and lived at Nus-Hayiges-Mls. When she was about 25 years old, witness, her husband, and her aunt used to go across the Columbia and pick berries in Oregon, seeing Indians fishing in the Columbia at that time; an ocean canoe would carry fifteen or twenty; "when they got a lot of packages and things, can carry about fifteen or twenty big size people"; they used to come in four or five canoes; when they went by way of Willapa Harbor and Shoalwater Bay they took small canoes that would hold about five; five or six small canoes would go; before wagons were used to haul the canoes over the portage, they used to come through by Black Lake using sticks for rollers.

George Charley, one of those named as plaintiffs herein, testified that he belonged to the Quinaielt Tribe; that his mother was a full-blood Quinaielt, and that he is an allottee on the Quinaielt reservation; that he was born in 1862; general occupation that of a fisherman in the Columbia river; that he has lived a little while at Taholah on the Quinaielt reservation, but his home is in Tokeland (on the north shore of Shoalwater Bay); that he has lived on Shoalwater Bay ever since he was born; that he was about 15 or 16 when he first went to the Columbia and about 17 when he started to work; first saw Quinaielt Indians fishing on the Columbia in 1878; saw them there "mostly every year"; that it was a matter of Indian tradition that they had been going to the Columbia river to fish long before the treaty was made and long before the white people discovered the Columbia river; the Indians used to take the inside route when the ocean was rough from Shoalwater Bay to the head of the bay or Willapa Harbor and there, in witness' time, would take a wagon over to Ilwaco; that witness had gone twice when first married in 1883 or 1884 by way of the ocean over the bar; that sometimes the Indians would go down there in numbers, the Quinaielts and Shoalwater Bays; that the plaintiffs Mitchell Charley and Roland Charley are sons of plaintiff George A. Charley, and each one is allotted on the Quinaielt reservation; plaintiff was fishing from 1878, most seasons under an arrangement with "McGowan Sons" by which arrangement McGowan Sons furnished the seines and equipment and provisions for the crew who caught the fish and turned them over to McGowan Sons; after the expenses were paid, McGowan Sons got one-third and the plaintiff paid himself and the crew from the remaining two-thirds; the crew was composed of Indians of the Quinaielt Tribe; "I recall quite a bit of them are living yet"; in the beginning there were between twelve and fifteen in the crew; from 1878 to 1907, with the exception of two years, the witness fished under a like arrangement with McGowan, with the possible exception of 1895, concerning which year the evidence is not clear; in 1894 first used horses in dragging the seines; that year a large Indian crew was used, twenty-six men, mostly Quinaielts; up to 1901 the crews were Indian crews and averaged from twenty to twenty-four, mostly Quinaielts; from 1903 to 1907 other Indians also fished these waters, which Indians, with the exception of those in 1906, were Quinaielt Indians; during the fishing season the Indians dried the fish for their winter use; they also had the fish that were not sold; the last day of the season they would have all they wanted for their own use; on this last day, if they got more than they could use, they turned them over for commercial purposes; always what was caught on the last day was for the benefit of the Indians; from 1921 to 1927 witness fished under arrangements, in the main, similar to those already described, the crews were, during this time, all Indians; in 1925 there were thirty-two men in the crew, all Indians; in 1928 did not fish on Sand Island or Peacock Spit, being still prevented by the injunction from fishing the latter location; in 1929, after fishing about three hours, was forcibly prevented by the defendants Bakers Bay Fish Company and the defendant W. L. Thompson; that during the last ten to twenty years Quinaielt Indians have fished with their own equipment in the Columbia river, among others, Billy Calhoun, Paul Petit, Paul Jones, Lincoln Lewis, Joe, Grant, and Bill Elliott, Charley Wain, Tim Driscoll, Ernest Wilson, all of whom plaintiff believes are allottees on the Quinaielt reservation; Billy Calhoun, Hal Petit, and Paul Jones, most of them are pure bloods and half-breeds, all allotted at Quinaielt; first fishing arrangement was with P. J. McGowan, now deceased, father of defendant McGowan; plaintiff had no Chinooks in his crew; they are mostly dead; "nothing but Quinaielts go over there;" in 1878 there were some Chinooks, but they were old.

Under the heading "Chinook" in the Handbook of American Indians, pt. I, p. 272, it is stated: "The Chinook were first described by Lewis and Clark, who visited them in 1805 * * * Lewis and Clark estimat-

ed their number at 400, but referred only to those living on Columbia River." (This evidently means that Lewis and Clark did not include those living on Shoalwater Bay.)

Swan, in his book, chapter XIX, states, in effect, that because of a misunderstanding, there were only 112 Chinooks present on the treaty ground in 1855.

The plaintiff George Charley further testifies that there were "young breeds" over there; do not know whether they were Chinook or what tribe they were; "most of them was working of course;" McGowan had nothing to say as to who plaintiff hired; some of the crew brought their wives, some did not, because it was inconvenient; they only had tents and some were unmarried; "the old fishing ground of the Indians is from Point Ellis down to Fort Columbia, that is one place; one place was claimed by the Chinook Indians, two tribes of Indians, the Sand Island outside and inside; they never let no other tribe come in there to fish because they claimed that."

There is no map or chart in evidence showing Sand Island above low water before 1841.

This witness further testified:

"Q. Where did you get these Indians that were in your crew? A. Well, every year the Indians goes over there to work, every spring, because the oystering, and in Shoalwater, Bruceport, Bay Center and Oysterville (all of the places mentioned are on Shoalwater Bay) was worked by the women folks and man folks don't like to oyster very much but the women folks come like to make a few dollars in oysters so the men go over to Columbia River and works and fish there.

"Q. The men you employed were all living on Shoalwater Bay, weren't they? Your entire crew came from Shoalwater Bay? A. Yes, they go over there—Quinaielt, from Grays Harbor and all over there, mostly from Quinaielt because the women folks are there, their wives work in the oysters."

It would appear that the Shoalwater Bay oysters were not handled commercially before 1851. Swan's book, p. 25.

On redirect examination the above-named plaintiff testified that he got his crew together in April and May; that he would generally go to Quinaielt and from Quinaielt to Grays Harbor and Shoalwater Bay for that purpose; that he followed this practice every year.

L. L. Bush, a witness for the plaintiff, testified: That he was a white man and would presently be 63 years of age, and had lived at Bay Center for about fifty-three years and in Pacific county about fifty-nine years; that he talks the Chinook jargon and the Lower Chehalis language somewhat, the latter being of the same Salish group as the Quinaielts; the only place the witness saw the Quinaielts fishing was oystering.

This witness further testified that the Quinaielts stopped and picked oysters in the spring before going to the Columbia; that he is familiar with the Quinaielts and their history and traditions; that their tradition is that they (the Quinaielts, Chinooks, Lower Chehalis, and Willapas, the latter having disappeared) passed freely forth and back, were friendly with each other, intermarried, and fished on each other's grounds; that the Quinaielts coming from the north would come down and fish; "would fish up in their own fields and others would come down and fish in Grays Harbor by their own field, I mean, Quinaielt rivers, lakes, bays and would fish also in Grays Harbor and Willapa (Shoalwater Bay) and would cross on over either by the portages or by canoes outside to the Columbia River, and fish there, and the Chinooks likewise, would go over in the Salishan territory, according to the season of the year, and fish;" in the Columbia river, according to tradition, the Quinaielts fished anywhere they could get fish, with the exception of one or two small lagoons up in the mouth of the Chinook river where certain individuals claimed personal hereditary rights, otherwise anywhere they could find fish, namely, salmon and sturgeon; they went mainly to fish at the mouth of the Columbia river.

This witness stated that N-us-Hayiges-Mls is as near the English spelling of the Indian name for Cape Disappointment as you can get.

Testifying further regarding the habits of the salmon around the mouth of the Columbia river, this witness stated: "They begin running in the Columbia River in the early spring, the largest and best fish in the early spring, runs come in from time to time during the spring and summer, along in the fall; the heaviest run in mid-summer. The fish hang around in the mouth of the river until they choose to go up, as the Indians used to say, until they get the strength but I don't suppose that is the reason, but that is a part of the fact; they hang around there until they are ready or choose to go on up and work

their way upstream, hang down there sometimes briefly, just a week or two, sometimes hang around there a month or two before the same fish will go on up the streams."

This witness further testified that traditionally the Indians were accustomed to cross the Columbia river bar in going to the Columbia river, but that method had ceased practically before the witness' early recollection; their canoes were then transported along the beach by wagons brought in by the whites; according to tradition, the Indians went to the Columbia river sometimes singly and sometimes in several canoes; the larger canoes would take twenty or more passengers in inside waters and perhaps eight or ten outside; traditionally there were much larger canoes; in fishing, the Indians seldom used spears after the whites came and gave them metal hooks; the seines of Indian manufacture have not been used since the whites brought in their cordage; it is a tradition that Kape was a Quinaielt chief, that is, one of the chiefs; at the same time there was Taholah, who was also reckoned a chief; there was a division of authority.

The chart opposite page 972, part 1, Handbook of American Indians, shows that the Salishan family occupied a considerable territory in Washington, Western Montana, Northern Idaho, and British Columbia, including the headwaters of the Cowlitz, which flows into the Columbia river. The court cannot find that there is any evidence that the Chinooks ever fished in that part of the Salishan territory occupied by the Quinaielts or Quillehutes.

Testimony cumulative in its nature and in that sense corroborative of the foregoing has been given by a number of other witnesses testifying for the plaintiff. A description of these witnesses, as given by themselves, is as follows:

Charles D. Beck stated that he was past 85 years of age; that he has lived on Willapa Harbor since 1855; that he first engaged in oystering, at which he was engaged until 1880, when he took charge of a transfer team from Willapa Harbor (Shoalwater Bay) to Ilwaco at the mouth of the Columbia river, driving stages and transfer wagons from the upper end of Shoalwater Bay to Ilwaco.

Adelaide Stewart Taylor stated that she was 68 years of age and belonged to the Quinaielt Tribe, her mother being a full-blooded Quinaielt Indian; that she lived at Ocean Park since 1886 (this is a place on the Pacific Ocean about fifteen miles north of the mouth of the Columbia river); that she was about 19 years old when she went to the Columbia river.

William A. Elliott stated that he was an allottee on the Quinaielt reservation; that he had lived at Aberdeen, Wash., for about seven years; that he was 60 years of age, born close to Dahlia on the Columbia river, seventeen miles from its mouth, where he had lived up to the time of going to Aberdeen; that witness' business and that of his father was fishing; that he is one-quarter Indian blood; that his grandmother was a full-blooded Quinaielt who lived at Dahlia most of the time; that witness' father employed a crew for fishing who were some Quinaielts but mostly Chinook Indians.

Dick Lewis, also called Tyhee Dick, testified that he was a Skokomish Indian, past 90 years of age, related to Johnnie Johns and Samson Johns. (The Skokomish Indians are a body of Salish who lived at the mouth of the Skokomish river which flows into the upper end of Hoods Canal.) He further testified that when he first went to the Columbia river he was "maybe" 12 years old.

Peter Williams testified that he was 58 years old; belonged to the Quinaielt Indians at Taholah; that Chief Kape was his grandfather, his mother's father; that he (the witness) went to the Columbia river thirty-three or thirty-four years ago when he saw Quinaielt Indians fishing for salmon at Nus-Hayiges-Mls; that they dried them "in the cover there" (under cover there); they used to take an Indian mat, a great big one twenty or thirty feet long, put up a big stick, and make a house out of it, and they dried fish in there; that they had an Indian village there; that witness had been at the Columbia river three times, the last time between thirty-three and thirty-four years ago.

Ben Armstrong testified that he was 72 years old; that his mother was a Quinaielt; that he has lived at Georgetown four or five years; that he lived in Bruceport from 1869 to 1874 (both of the places named are on Shoalwater Bay); that prior to living at Bruceport he lived on the Oakville reservation (this reservation was created for the Chehalis Indians by Executive Order in 1886, Kappler, vol. 1, pp. 901 to 904); that he was born on Grays Harbor and first went to the Columbia river in 1886; that he went to the Columbia river, he supposes, a dozen times; on his first trip he saw but one boat of Quinaielts fishing; that that was the only

437

time he saw Quinaielts fishing there (south of Cape Disappointment).

James A. Petit testified that he was 72 years old; that he was born in Marion county, Or.; that his mother was a half-breed Quinaielt Indian; that he is an allottee on the Quinaielt reservation; that when about 9 years old he was at the mouth of the Columbia river, going to Chinook with his father, mother, and family; his father was a fisherman; that witness had lived at Chinook twenty-six years; that he had fished in the neighborhood of Cape Disappointment, Sand Island, and Peacock Spit since he was 14 years old until he was 27; that he was 36 years old when he left there. It will be noted that the witness does not state as to the proportion of his own Indian blood. Petit was one of the employees of the Northwest Company mentioned by Henry in his journal.

Emma Luciers testified that she is 66 years old; that her father was a Chinook and mother a Cowlitz (the Cowlitz were a Salish Tribe on the Cowlitz river fifty miles or more from the Quinaielt river and reservation); that she was born at Kelso (a town at the mouth of the Cowlitz river where it flows into the Columbia river); that she has lived at Bay Center (on Shoalwater Bay) for fifty-three years; that she was 13 years old when she came to Chinook; that she first went from Shoalwater Bay to the mouth of the Columbia river with her father, mother, uncle, and some others when she was 13 years old; that most of the Indians in that part belonged to the Willapa Harbor (the Willopahs were a Chinook Tribe); that she went a great many times to the mouth of the Columbia river from Bay Center; that she married when 16 years of age and she and her husband used to go there nearly every season; that her ancestors had lived at the village of Nus-Hayiges-Mls for a number of years before white men came into the country; that the houses were built out of a mat that they build for their summer homes.

Simon Charley testified that he was 55 years old; born at Bonne river near Bay Center on Shoalwater Bay; that he is a brother of the plaintiff George Charley and an uncle of the plaintiffs Roland Charley and Mitchell Charley; that he lives on the Quinaielt reservation and is about half Quinaielt and half Lower Chehalis; that his grandfather was a Grays Harbor Indian and his mother part Quinaielt; that he lived in Georgetown (on Shoalwater Bay) until old enough to go to school, and was then sent to the Quinaielt reservation; occupation is fishing, mostly in the Columbia river where he first fished when about 15 or 18; was about nineteen years old when he began fishing for McGowan (father of the defendant in suit No. 331–E); that he fished for McGowan at Chinook until going to school in 1892; that quite a few salmon come to Shoalwater Bay, but salmon come to the bays in different seasons; there were also clams and oysters there; the fishing in the Quinaielt reservation is not the same season as the Columbia river; there are less fish in the Quinaielt river than several years ago; there are traps in the Quinaielt river, but it was not entirely taken up with locations in the early days; there are not enough fish for all the tribe.

Alex Luciers testified that he was 74 years of age, part Chinook and part Grays Harbor (Lower Chehalis); that he lived on Willapa Harbor and was born at St. Louis, Or., in which state he lived until he was 7 years old, moving to Chinook when 11 years of age, where he lived until he was 34; that he has lived on Willapa Harbor for forty years; that he came back to the Columbia river during five or ten years after moving to Willapa Harbor; that witness' mother and grandmother (on the Indian side) told him he was half Indian.

William A. Church, a white man, testified that he was 75 years of age, living at Ilwaco since 1866; that there was a village (Indian) at Ilwaco, and there was another village called Pacific City on Cape Disappointment; that there were two, three, or four houses, and might have been as many as five, in Pacific City; houses were made of lumber boards; there were Indians in Pacific City and Indians stopped there; never saw white people living there.

Robert B. Taylor testified that he is part Quinaielt blood and allotted on the Quinaielt reservation; that he has lived at Ilwaco for twelve years; that his occupation is that of fishing or operating boats in connection with fishing; that he has always been connected with fishing or the United States Coast Guard or oystering on Willapa Harbor (Shoalwater Bay); that he was connected with the Coast Guard at Ft. Canby in 1908 and 1909 and was at Ft. Canby in 1911, during which time he saw William Calhoun, Charlie Waine, William, Joe, and Grant Elliott, and Jason Millett fishing off of Cape Disappointment with Quinaielt Indian crews.

This witness was a member of the crew with George Charley when forcibly prevented

by defendants Bakers Bay Fish Company and W. L. Thompson from fishing on Peacock Spit.

W. R. Vaughn testified that he was 69 years of age; that his business has been that of fishing, logging, and other occupations; that he fished on Sand Island and Peacock Spit "along there" in 1905, 1906, and 1907; when 6 years of age he lived at Ft. Canby; that his father was a soldier stationed there; that was in 1861; was there from 1861 to 1868; that witness was 6 or 7 years old when he saw Indians fishing there (at this point the transcript is evidently incomplete); the Indians said they were Quinaielts.

It was admitted in open court by the defendants that George Charley, Mitchell and Roland Charley, plaintiffs, and Billy Calhoun, Paul Petit, Paul Jones, Joe, Grant, and Bill Elliott, Tim Driscoll, Charley Wain, and Ernest Wilson were all allottees and fished on the Columbia river "through these zones."

The defense witnesses, many of whom had resided at Ilwaco and vicinity on Bakers Bay for many years, testified that they never had heard, previous to the instituting of this and other recent litigation, of the Quinaielt Indians claiming any fishing rights in the Columbia river. Many of them testified that Indians did not and could not fish prior to the building of the jetties at the mouth of the Columbia river at the place in question, the first of which was begun about thirty years after the making of the treaty.

Swan, who lived on Shoalwater Bay before, at, and after the time of the Quinaielt Treaty meet, says of Shoalwater Bay, at page 26 of his book:

"The shoals are covered with shell-fish, among which the oyster is the most abundant, and constitutes the principal article of export. Several varieties of clams, crabs of the largest size, and of a most delicious flavor, shrimps, mussels, and a small species of sand lobster, are in the greatest abundance, and furnish nutritious food, not only to the different tribes of Indians who resort to the Bay at different seasons to procure supplies, but also to the white settler, who is thus enabled to greatly reduce the expense of living when compared with those settlements on the Columbia River and interior where provisions of all kinds are usually scarce and high.

"The waters of the Bay, and all the streams that enter into it, are well stocked with fish. Salmon of several varieties abound, and are taken in great numbers by the Indians for their own food or for trading with the whites. Sturgeon of a very superior quality are plenty, and form a principal item in the stock of provisions the Indians lay by for their winter use.

"The rivers and mountain streams abound in trout flatfish, such as turbot, soles, and flounders, are plenty, and in the spring, innumerable shoals of herring visit the Bay, and are readily caught by the Indians, either with nets, or in weirs and traps, rudely constructed of twigs and brush."

The Indians assembled on the treaty ground Swan describes as follows, at page 346 of his book:

"The whole together only numbered 843 all told, as may be seen by the following census, which was taken on the ground:

| | |
|---|---|
| Lower Chehalis | 217 |
| Upper " | 216 |
| Queniults | 158 |
| Chenooks | 112 |
| Cowlitz | 140 |
| | 843" |

The treaty which Governor Stevens proposed and which was rejected by the Indians because of objection by Indians other than the Quinaielts is epitomized by this author, in part, as follows, at pages 343 and 344 of his book: "The Indians were to cede all the territory commencing on the Pacific Coast * * * thence southwestwardly to the land of the Upper Chenooks, to the Columbia River, and down that river to the sea."

That part of the boundary described in the foregoing quotation would have been along that part of the river opposite the fisheries in question. From this it has been argued on behalf of plaintiff that an intent to secure to the Quinaielt and Quillehute Indians a right to fish in this part of the Columbia river is shown. Such argument falls because of its own weight.

The boundary of the ceded territory above described was along that part of the river the banks of which were occupied by the Chinook Indians and along which were their fishing villages and in which they at least were accustomed to fish.

The Chinooks refused to accept the proffered treaty, and the proposed southern boundary of the ceded territory was withdrawn from the Washington bank of the Columbia river further to the north.

If all of the Indians assembled at the treaty meet mentioned had accepted the proffered treaty and it had contained an article similar to article 3, it may be conceded that

the Quinaielt Indians would, under that article, have had the right to fish in the estuary of the Columbia river with the Chinooks because of its being a customary fishing place of the latter tribe, but in such event the Chinooks would have had the correlated right to fish within the reservation and a right to fish in those places the Quinaielts were accustomed to fish, but the proffered treaty having been rejected the Chinooks have no such rights, and, the quid pro quo being wanting, there can have been intended no recognition growing out of these negotiations of a right on the part of the Quinaielts to fish in a Chinook fishery.

The following appears in Bancroft's History of the Northwest Coast, vol. I, pp. 447 and 448:

"To facilitate business their territory was divided by the Hudson's Bay Company at various times in various ways. * * * The Columbia department was afterward divided and called the Oregon and Western, the term Columbia being used thereafter as a district.

"14 House of Commons Report on Hudson's Bay Company, 365–7. In this report, *printed in 1857*, the Northwest Coast is accredited with two departments, eight districts, and thirty posts, as follows:

| Post | Locality | Department | District | Number of Indians frequenting it. |
|---|---|---|---|---|
| Cape Disappointment | Washington Ter. | Oregon | Columbia | 100 |
| Chinook Point | Washington Ter. | Oregon | Columbia | 100" |

Plaintiff contends that the former Indian village upon Cape Disappointment alluded to by the witnesses McGowan, Johnnie Johns, James Julius, and Emma Luciers was a Quinaielt village. The evidence fails to establish this.

This village was in territory classed as Chinook or Chinookan territory. The Chinookan family is a separate family with a separate language from the Salishan, to which latter the Quinaielts belonged. The Chinooks occupied both sides of the Columbia river and the greater part of the shores of Shoalwater Bay. Handbook of American Indians, pt. 1, p. 273, heading "Chinookan Family." See, also, the chart opposite page 972 of the same volume.

It appears more reasonable to conclude that any village or villages formerly located on Cape Disappointment, or the shores of Bakers Bay, were Chinook villages and not Quinaielt villages.

Upon the Vancouver map of 1792 appears the outline of an anchor at certain places, one of which is inside of Cape Disappointment opposite and near the point where the testimony would indicate there formerly was an Indian village. Testimony indicates that such a mark designates a point at which an anchorage was made, probably by Lieutenant Broughton.

The witness McGowan's statement that "this village was destroyed by an epidemic of small-pox very early, the time uncertain; before any of the Americans" (came to the country), the court is unable to accept.

The House of Commons Report, *printed in 1857*, here quoted, evidently refers to this village. The Hudson's Bay Company did not enter the territory in question prior to 1824, before which time the Astor Company, that is, the Pacific Fur Company and the Northwest Company, which about 1824 amalgamated with the Hudson's Bay Company under the latter's name, previously had establishments at Astoria.

The Handbook of American Indians, pt. 1, under the heading of "Chinookan Family," at page 274, states: "The region occupied by Chinookan tribes seems to have been well populated in early times, Lewis and Clark estimating the total number at somewhat more than 16,000. In 1829, however, there occurred an epidemic of what was called ague fever, of unknown nature, which in a single summer swept away four-fifths of the entire native population. Whole villages disappeared, and others were so reduced that in some instances several were consolidated. *The epidemic was most disastrous below the Cascades.*" (Italics the court's.)

The disappearance of the village in question, it would appear more reasonable, in view of the House of Commons Report, to attribute to this epidemic than to one before the coming of the white man, the Americans, to the mouth of the Columbia river.

Upon Exhibit No. 52, "Chart of the Columbia River for 90 Miles from Its Mouth," which is undated but recites that it is drawn from several surveys in the possession of W. A. Slacum, U. S. N. (It was stated upon the

trial that Mr. Slacum was with the Wilkes expedition and the Wilkes map of the mouth of the Columbia river, Exhibit No. A–4 is dated 1841), there appears, near the mouth of what is evidently the Chinook river, which empties into Bakers Bay, the following: "Chenamus Village."

Johnnie Johns' testimony above quoted as to George Charley's uncle being named "Chemamus" does not identify him with the place "Cheñamus" marked on this map (Exhibit No. 52).

■■ If the testimony of plaintiff's witnesses, which has been summarized herein, was corroborated to a reasonable degree, it no doubt would support a finding that it was prior to the treaty, the custom of a considerable number of Indians of the Quinaielt Tribe to resort annually to the estuary of the Columbia river to fish. It is a 'rule in weighing evidence that the court will consider whether testimony has been corroborated where it would be reasonable to expect corroboration, if it were true. It is concluded that the plaintiff's testimony in this case lacks corroboration reasonably to be expected in a number of important particulars.

Few of the witnesses who have testified appear to be of pure Quinaielt blood. The claim asserted being one on behalf of the Quinaielts and the case resting almost entirely on tradition, it would be expected that the required tradition would be established by pure Quinaielts, for the current of tradition is less likely to be contaminated by alien tradition where it comes from those of pure blood.

Had the Chinook Indians been parties to any treaty, with provisions similar to those in article 3, the witnesses in this case of Chinook rather than Quinaielt blood might be considered disinterested or as testifying against interest.

It was held by the District Court in the case of United States ex rel. Williams v. Seufert Bros. Co., 233 F. 579 at page 589, that Indians exercising their treaty right in such a fishery are not limited to those methods used by them in times before the treaty. The evidence in the present case shows that in fishing for salmon in the locality in question crews of men numbering at one time as many as thirty-two were used, and that, where the fishing operation was under the direction of George Charley or others of Indian blood or part Indian blood, the crews were generally of similar blood. Under these circumstances the court is unable to find that the witnesses of predominant Chinook blood are entirely disinterested in the outcome of the case.

Concerning the testimony of the witnesses who have testified they were allottees, it is to be noted that nothing has been shown concerning their status in the Quinaielt Tribe— whether they became members of the Quinaielt Tribe by adoption subsequent to the treaty or were recognized members of the Quinaielt Tribe at that time or of such ancestry.

It will be further noted that there is no testimony as to any protest or claim touching fishing rights at the mouth of the Columbia river asserted by any Quinaielt tribal council. The evidence rather tends to show that the individual claims asserted here are rather on behalf of those who are as closely or more closely related to the Chinooks, whites, or otherwise, than to the Quinaielt or Quillehute Tribes.

On behalf of plaintiff, it has been contended that George Charley, a Quinaielt Indian, has fished in the Columbia river near its mouth with crews predominantly Quinaielt, numbering from twelve to thirty, for the greater part of the time for fifty years. It is argued that this evidenced a continued exercise of the treaty fishing right by the Quinaielt Indians. Under these circumstances it was reasonable to expect that corroborating testimony, giving the names of the men making up those crews, together with evidence establishing their Quinaielt status would be given. Such testimony is almost entirely lacking. Fifty years of intimate relation with the members of a small community held together by ties of blood, custom, and the effect of special laws doubtless would have enabled a man of the intelligence and retentive memory evidenced by the plaintiff George Charley to have advised the court of the identity of the Quinaielt Indian members of his crews.

The Commissioner of Indian Affairs has the management of all Indian affairs and all matters arising out of Indian relations (title 25, USCA § 2), including the supervision of the expenditure of money appropriated by Congress for the care and assistance of Indians (Id. § 13).

■ The court takes judicial notice of the fact that for the information of the Commissioner, in order to enable him to discharge his duties, reports are made by the various Indian Agents touching the care, employment, and activities of the Indians belonging to agencies and upon reservations. Therefore if, following the treaty and appointment of agents for the Quinaielt Indians and reser-

vation, a sufficient number of them engaged in fishing in the Columbia river to show that it was a usual and accustomed fishing ground and station of the Quinaielt Indians, evidence of that fact, it may reasonably be expected, would appear in such reports. Nothing of the kind has been shown.

So far as the evidence shows, there appears not to have been any necessity for the Quinaielt Indians going so far from their homes as is claimed for the purpose of securing fish. As pointed out, in the Journals of Lewis and Clark, it was stated: "The Quinna-Chart (Quinaielt) nation who reside six days march to the N. W." (from the estuary of the Columbia River).

The differences between the habits of the fish-eating Indians of the Pacific Coast and the plains Indians should, in this connection, be kept in mind.

The villages of the former are uniformly found on the streams and in case of the smaller streams, at the mouth thereof. The source of food supply fixes their habitations, while in the case of the plains Indians who followed the game in their hunting they roamed and wandered to a far greater extent than is true of the fish-eating Indians of the Pacific Coast. Handbook of American Indians, under heading "Food," pt. 1, p. 466, and under heading "Nez Perces," pt. 2, pp. 66 and 67.

On behalf of plaintiff it has been contended that the present suit falls squarely within the ruling of the court in Seufert Bros. Co. v. United States, 249 U. S. 194, 39 S. Ct. 203, 63 L. Ed. 555, affirming United States ex rel. Williams v. Seufert Bros. Co. (D. C.) 233 F. 579. There are certain facts and circumstances that distinguish the present from that suit. In that case, involving the Indians of the Yakima Tribes, the land ceded bordered on the Columbia river, being to the north of such stream. The fishery in suit was along the opposite or southern bank. The southern boundary of the Yakima reservation authorized by the treaty was but from fifteen to twenty-five miles north of the river. The intervening was open country easily traveled by the means used by the Indians. There were no numerous intervening waters "teeming with fish." Such streams as there were in the territory between the Yakima reservation and the river emptied into the Columbia. While in the suit mentioned the court considered the question of fact of whether the Yakima Indians resorted to the south bank of the river to fish, both before and after the treaty, such was not the main question considered therein. The

court, at pages 195, 196 of 249 U. S., 39 S. Ct. 203, 204, 63 L. Ed. 555, says: "As stated by counsel for the appellant the most important question in the case is this: Did the treaty with the Yakima Tribes of Indians ceding to the United States lands occupied by them, on the north side of the Columbia river in the territory of Washington and reserving to the Indians, 'the right of taking fish at all usual and accustomed places, in common with citizens of the territory' give them the right to fish in the country of another tribe on the south or Oregon side of the river?"

In construing how an unlettered people (the Yakima Indians) would understand the language, "the right of taking fish at all usual and accustomed places," the court said: "This treaty was one of a group of eleven treaties negotiated with the Indian tribes of the northwest between December 26, 1854, and July 16, 1855, inclusive. Six of these were concluded between June 9th and July 16th, inclusive, and one of these last, dated June 25th, was with the Walla-Walla and Wasco Tribes, 'residing in Middle Oregon,' and occupying a large area, bounded on the north by that part of the Columbia river in which the fishing places in controversy are located." Kappler, vol. II, p. 714, 12 Stat. 963.

The court notes the circumstance that, while the land ceded by the Wasco Tribe was bounded on the north by the Columbia river and included the fishery in question in that suit, yet the tribe making the cession was "residing in Middle Oregon," which would be a distance considerably greater from the fishery in question than any part of the Yakima reservation.

In the present case the court is asked to find that by the treaty a fishery was secured to the Quinaielt and Quillehute Indians six days' journey from the region of their residence and that fishery in the heart of territory occupied by another tribe, one of alien speech, Chinook—a fishery within sight of the principal village of the Chinook Tribe, if not the principal village of the entire Chinook group or family.

While it is not discussed by the Supreme Court, in construing article 3 of the Yakima treaty, the District Court (United States ex rel. Williams v. Seufert Bros. Co., 233 F. 579–585, et seq.) gave particular attention to the Wish-ham Tribe, parties to the Yakima Treaty. The principal village of this tribe was on the Columbia river. Handbook of American Indians, pt. 2, p. 965, with notes under "Wish-ram."

In this connection it should also be remembered that prior to the conclusion of the Quinaielt Treaty negotiations with the Chinooks, looking to the making of a treaty had failed. In fact, no treaty with them was ever made. Under such different facts and circumstances, it is clear the present case does not fall within the rule established by the case of Seufert Bros. Co. v. United States, supra.

Corroboration by matters contemporary in their nature is obviously of particular value in determining the truth of statements concerning conditions so long past.

The white men first establishing themselves at the mouth of the Columbia river were there solely for the purpose of trading with the Indians. This would include the Pacific Fur Company, Mr. Astor's company, and its successor, the Northwest Company. The Hudson's Bay Company which later amalgamated with the Northwest Company, it is true, became interested in the development of other interests, but its main purpose in the beginning was trade with the Indians. No single sentence has been called to the court's attention in the journals and reports of the agents, officers, or employees of these companies showing or tending to show that Quinaielt Indians were accustomed to resort to the mouth of the Columbia river for the purpose of fishing.

Extracts have been read in evidence from the Journals of Lewis and Clark, Henry's Journal from the Henry-Thompson Journals, Bancroft's History of the Northwest Coast, and Irving's Astoria, together with Swan's The Northwest Coast; or Three Years' Residence in Washington Territory.

The court has also examined, among others, the books of Alexander Ross, Ross Cox, and Gabriel Franchier, each of whom were agents stationed at Astoria (on the south side of the estuary at the mouth of the Columbia river) prior to 1820 by the fur companies already mentioned.

The court has been able to find nothing in the nature of corroboration for the claim made, that the estuary of the Columbia river was a tribal fishing ground of the Quinaielt Indians.

The plaintiff contends that the following from the Journal of Henry, an agent of the Northwest Company, does so (volume II, p. 789, New Light on the Early History of the Greater Northwest, Henry-Thompson Journals by Elliott Coues):

"January 7th, 1814:

" * * * The great smoke which rises from the three Chinook villages denotes the return of the people, as usual at this period; they will increase in numbers daily, as smelt-fishing is approaching fast; sturgeon-fishing follows, and then salmon-fishing as spring draws near. *The natives from the N. will also bend their course here.*" (Italics the court's.)

On account of the greater ease of access to Bakers Bay from Shoalwater Bay, because of the portages, particularly the Black Lake portage, over that from either Grays Harbor or the Quinaielt river and reservation sections, it is more reasonable to conclude that the "natives from the N (north)" referred to Shoalwater Bay Indians rather than those still further north.

The court deems of particular significance the following from Mr. Swan's book, pp. 78, 79, and 91:

"Among the Indians who came to the Bay to work was a chief of the Queniult Indians, a tribe who live on the banks of a river of the same name, which empties into the Pacific five miles north of Point Grenville, or about sixty miles north of Shoal-water Bay. This tribe is considered a very hostile race by the other Indians, and numerous massacres have been committed by them on the white traders in earlier times. The chief, whose name is Kape, was accompanied by two of his sons and a large party of his people. He came in a large canoe, which he wished to sell me, and as I wanted one of that description, I purchased his. The old fellow remained with me a couple of weeks, and we formed a great friendship for each other. His sons were the finest-looking Indians I have ever seen. The oldest, whose name is Wamalsh, was about twenty-two years old, six feet high, and most perfectly proportioned. The younger, named Wy Yellock, a lad of eighteen, although much shorter, was full as well proportioned, and very handsome. *Neither Kape or his sons could understand a word of the Chenook language,* and I had to employ an Indian to interpret. He was also a Queniult, and came with Kape. His name was Hait-lilth, and called by the whites John. He had been with some person from Oregon to the California mines, and could talk very good English."

"Old Kape and his sons were good hunters, and every season came to the Bay laden with furs, which they carried to the store of *the Hudson Bay Company at Chenook, on the Columbia River.*" (Italics the court's.)

The author's acquaintance with Kape and his sons was about the time of the treaty, 1854, and at that time the whites had been trading with the Indians at Astoria and Chinook for nearly fifty years. The fishing season on the Columbia river lasted more than half of the year; therefore that Kape, a chief of the Quinaielts, with grown sons, should be unable to speak a word of Chinook, if a sufficient number of Quinaielts yearly resorted to the Columbia river for purposes of fishing to make that a usual and accustomed place of fishing of that tribe is all but impossible.

■ Those of the Quinaielts who had intermarried with the Chinooks and fished in the estuary of the Columbia, which was beyond question a usual and accustomed fishing ground for the Chinook Indians, would, without something further, be viewed in that connection as members of the families of their Chinook relations rather than as fishing by reason of any Quinaielt tribal right or custom. It appears reasonable to conclude from all of the evidence that any fishing by Quinaielts, at and prior to the time of the treaty, in the estuary of the Columbia river, was occasional rather than a usual and accustomed practice, and that in entering into the treaty the Quinaielt and Quillehute Indians could not have understood otherwise.

The bills of complaint will be dismissed. The clerk will notify the respective parties of this ruling.